## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

PROPHET MORTGAGE OPPORTUNITIES, LP,

        Plaintiff,

        -v-

CHRISTIANA TRUST, a division of Wilmington Savings Fund Society, FSB, as both Owner Trustee and Indenture Trustee of RBSHD 2013-1 Trust,

        Defendant,

and RBSHD 2013-1 TRUST,

        Nominal Defendant.

Case No. ___22-cv-9771___

## VERIFIED COMPLAINT

PROPHET MORTGAGE OPPORTUNITIES, L.P. ("Prophet"), by and through its attorneys, Schulte Roth & Zabel LLP, alleges for its Complaint as follows:

## NATURE OF ACTION

1.  By this action, Prophet seeks to hold Christiana Trust, a division of Wilmington Savings Fund Society, FSB ("Christiana Trust") accountable for knowingly assisting Matthew Browndorf and his affiliates in misappropriating more than $40 million in mortgage loans. Christiana Trust provides institutional corporate trust and agency services and serves as the trustee of a residential mortgage backed securities ("RMBS") known as RBSHD 2013-1 Trust (the "Trust"). The very essence of Christiana Trust's job as trustee was to *protect* the Trust estate and the Trust's noteholders. Not only did Christiana Trust fail to protect the Trust estate and

1

noteholders, it instead knowingly, willfully, and actively participated in Browndorf's scheme to defraud them.

2.      Christiana Trust first knowingly assisted in Browndorf's fraudulent scheme when it gave him access to the Trust's mortgage loans, despite the fact that Christiana Trust knew that Browndorf already had concealed and misappropriated Trust assets, was not qualified for the role in which he sought access, and was specifically warned that by the party he was replacing that Browndorf would use this additional access to further conceal and misappropriate Trust assets.

3.      Christiana Trust thereafter continued to knowingly participate and assist in Browndorf's fraudulent scheme by "selling" millions of dollars of Trust assets to a Browndorf-related entity in two insider transactions in exchange for *zero dollars*.  The first sale, at a minimum, expressly violated Christiana Trust's contractual obligation to sell assets to an unaffiliated entity in an arm's length transaction.

4.      The second, larger sale is even more problematic because it happened after an "Event of Default."  The Event of Default occurred when Browndorf caused the Trust to cease making any payments whatsoever to noteholders and caused Christiana Trust to have heightened contractual and legal obligations to the Trust and noteholders.  Christiana Trust disregarded those heightened obligations, not only by conveying millions of dollars of Trust assets for no value, but also by misrepresenting the second sale to noteholders.  Indeed, Christiana Trust told noteholders that the sale of mortgage loans would generate cash to cure the Event of Default.  But Christiana Trust knew that representation to be untrue when made because it already had executed the sale documents and, therefore, already knew that the sale would not provide the Trust with any cash.

5.      As a direct and proximate result of Christiana Trust's wrongful conduct, the Trust estate has been decimated and Prophet and the other holders of RBSHD 2013-1 Asset-Backed

Notes, Series 2013-1 (the "<u>Notes</u>") will not be repaid the more than $66 million that they are owed. Prophet alone suffered damages of more than $37 million.

6. This action seeks both recovery for Prophet's damages and derivative recovery through derivative claims for the benefit of nominal defendant RBSHD 2013-1 Trust for the more than $40 million in collateral that Christiana Trust wrongfully diverted and allowed to be diverted to entities related to and controlled by Browndorf.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction over this action under 28 U.S.C. § 1331 for violations of the Trust Indenture Act of 1939 (the "<u>TIA</u>"), 15 U.S.C. §77aaa, and supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining claims.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(3) because Christiana Trust agreed to be subject to the Court's personal jurisdiction with respect to this action. Specifically, Christiana Trust agreed in Section 10.16(a) of an Indenture, one of the agreements at issue herein, to submit to the nonexclusive general jurisdiction of this Court.

## PARTIES

9. Plaintiff Prophet Mortgage Opportunities, LP is a Delaware limited partnership with a principal place of business at 5000 Plaza on Lake Blvd., Suite 180, Austin, Texas 78746.

10. Defendant Christiana Trust provides institutional corporate trust and agency services. It is a federally chartered savings association with its main office in the State of Delaware and is therefore deemed a citizen of Delaware. *See* 28 U.S.C.A. § 1348; 12 U.S.C. § 1464(x).

11. Nominal defendant RBSHD 2013-1 Trust is a statutory trust formed under the Delaware Statutory Trust Act, 12 Del. C. §§ 3801 *et seq*. At the same time the Trust was formed, it issued notes, secured by all right, title and interest to the Trust's assets, pursuant to an Indenture

3

that is governed by New York law.

## BACKGROUND FACTS[1]

12.     This case relates to Christiana Trust's breach of its obligations under the Transaction Documents of an RMBS securitization, as well as its knowing participation in the wrongful misappropriation of the Trust's Mortgage Loans[2] and proceeds from the sale of Mortgage Loans.  Christiana Trust served as both Owner Trustee and Indenture Trustee in the securitization. The below background facts describe the Trust, Christiana Trust's dual roles, and how Christiana Trust failed in both roles to the detriment of Prophet, the other holders of Notes (collectively, with Prophet, the "Noteholders"), and the Trust itself.

**A.**     **The RBSHD 2013-1 Trust Structure.**

13.     RBS Financial Products Inc. (the "Seller") acquired a pool of non-performing Mortgage Loans secured by first liens on residential properties from the U.S. Department of Housing and Urban Development ("HUD").  The Seller also acquired a pool of "REO properties," which are actual properties (as opposed to loans) that HUD acquired through foreclosure.  These Mortgage Loans and REO properties are collectively referred to as the "Mortgage Assets."

14.     The Seller then securitized the Mortgage Assets.  It did so by conveying them to RBS Acceptance, Inc. (the "Depositor"), who then transferred the Mortgage Assets to the Trust. The Trust then issued both Notes and "Certificates," pursuant to which the holders of each have a right to certain cash flows stemming from the Mortgage Assets in a certain priority.  Because the

---

[1] All terms not defined herein shall be given the meanings ascribed to them in the Trust Agreement, the Indenture Agreement, the Securitization Servicing Agreement, and the Mortgage Asset Purchase Agreement (collectively, the "Transaction Documents").

[2] "Mortgage Loans" refers to any mortgage loans identified in the "Mortgage Asset Schedule" attached to the Securitization Servicing Agreement.

Trust is the entity that issued the Notes, the Trust is also known as the "Issuer."

**B.      The Trust Agreement Creates Unsecured Certificates; Christiana Trust Serves as Owner Trustee and Owes the Duties of the Trust Itself.**

15.      The Trust issued Certificates pursuant to a Trust Agreement dated September 30, 2013 between the Depositor, Christiana Trust and Wells Fargo Bank, N.A., as "Paying Agent."  The Trust Agreement creates the Trust and a single class of Certificates that affords the Certificateholders certain rights of payment from the Mortgage Assets.

16.      Under the Trust Agreement, Christiana Trust served as "Owner Trustee."  It is called the Owner Trustee because, pursuant to the Trust Agreement, the Trust itself owns the Mortgage Assets.  Therefore, as the Owner Trustee, Christiana Trust represents the Trust and owes duties for the benefit of the Certificateholders, who are entitled to payment under the Trust Agreement.

17.      Pursuant to Section 6.02 of the Trust Agreement, Christiana Trust as Owner Trustee has a duty to discharge (or cause to be discharged) all of the duties expressly required to be performed by the Owner Trustee under the terms of the Trust Agreement and the other Transaction Documents to which the Trust is a party. Thus, Christiana Trust also owes duties to the other parties to the Transaction Documents.

18.      The Trust Agreement recognizes a "Majority Certificateholder," which is defined as the holder of Certificates evidencing not less than a majority of the average undivided beneficial interests in all Trust property and assets, and any proceeds thereof (the "Trust Estate").  The Majority Certificateholder enjoys certain rights under the Trust Agreement, including the right to direct the Trust to undertake certain actions.  However, the Majority Certificateholder's right to direct the Trust to take certain actions is not unfettered.  It is limited to actions in furtherance of the transactions contemplated by the Indenture and the Servicing Agreement.  *See* Trust

Agreement Section 2.03(vi).

19.      To that end, while the Majority Certificateholder may by written instruction direct the Owner Trustee in the management of the Trust, the Owner Trustee is not required to take any action instructed by the Majority Certificateholder if the Owner Trustee has reasonably determined that such action is, among other things, contrary to the terms of the Trust Agreement, any Transaction Document, or is otherwise contrary to law.

20.      Upon information and belief, at all times germane to this action, DCM-P1, LLC ("DCM-P1") was the Majority Certificateholder under the Trust Agreement.  Matthew Browndorf held himself out to the Owner Trustee as both the Managing Partner and the Chief Investment Officer of DCM-P1.  Upon information and belief, at all times germane to this action, Browndorf controlled DCM-P1 and owned or owns DCM-P1.

**C.**     **The Indenture Creates Issues Notes Secured by the Trust Assets; Christiana Trust Serves as Indenture Trustee and Owes Duties for the Benefit of the Noteholders.**

21.      As part of the same transaction, on September 30, 2013 the Trust (by and through Christiana Trust as Owner Trustee), the Paying Agent and Christiana Trust, as Indenture Trustee, executed the Indenture.

22.      Under the Indenture, the Trust (again also called the "Issuer") pledged all of its right, title and interest in essentially everything relating to the Mortgage Assets for the benefit of the Noteholders.  The Granting Clause of the Indenture defines the Mortgage Assets and all items relating thereto as the "Trust Estate" or the "Collateral."  The Granting Clause further specifically provides that the grant of the Trust Estate/Collateral is to secure the payment of principal of and interest on, and any other amounts owing, in respect of the Notes in the priority set forth in the Indenture and to secure compliance with the provisions of the Indenture.

23.     In essence, the Indenture provides that the entire Trust Estate is pledged to secure the Notes such that the Notes are secured.  The Certificates, therefore, are unsecured and have a right to payment only *after* the Noteholders are made whole.  Thus, by the specific design of the transactions, the Certificateholders receive nothing until the Noteholders are paid in full.

24.     Section 3.03 of the Indenture, entitled "Payment of Principal and Interest" confirms that the Noteholders are to be paid in full, secured by the Trust Estate, before the Certificateholders are paid anything.  In fact, there are fourteen steps regarding who is paid and in what amounts (commonly called a "waterfall"), and the Trust Certificates are only paid "any remaining amounts" as part of the fourteenth and very last step.

25.     Under the Indenture, Christiana Trust also serves as the Indenture Trustee. Pursuant to the Granting Clause, the Issuer grants the Trust Estate to the Indenture Trustee for the benefit of the Noteholders.

26.     Thus, Christiana Trust has two categories of obligations that it must fulfill under the Indenture (and Trust Agreement).  First, as Owner Trustee, Christiana Trust fulfills the Trust's/Issuer's obligations to the Indenture Trustee for the benefit of the Noteholders.  Second, as Indenture Trustee, Christiana Trust fulfills obligations directly for the benefit of the Noteholders. The Trust structure is rudimentarily depicted in the below chart:



**D.** **The Owner Trustee and Indenture Trustee Both Prescribe the Manner of Servicing of the Mortgage Assets Pursuant to the Securitization Servicing Agreement.**

27.     Given that the Trust Estate is comprised of non-performing loans and REO properties, the loans and properties must be "serviced" to generate cash flows so that Noteholders (and Certificateholders, after Noteholders are paid in full) may be paid.  Therefore, also on September 30, 2013, the Trust (by and through Christiana Trust as Owner Trustee), the Indenture Trustee (again, Christiana Trust), and the Paying Agent entered into a <u>Securitization Servicing Agreement</u> with Rushmore Loan Management Services LLC ("<u>Rushmore</u>") and Specialized Loan Servicing LLC ("<u>SLS</u>") as Servicers and RMS Asset Management, LLC ("<u>RMS</u>") as Credit Risk Manager (the "<u>Servicing Agreement</u>").

28.     The Servicing Agreement provides that Rushmore and SLS are to service and administer the Mortgage Assets in accordance with "Accepted Servicing Practices," the related

Mortgage Loan Documents, the Legal Requirements and the Servicing Agreement.  The Servicing Agreement provides instructions on collecting principal and interest on the Mortgage Loans, liquidation procedures for the REO Properties, and foreclosure procedures for Mortgage Loans for which the Servicer determines payment is unlikely to be collected from the mortgagor.

29.    The Servicing Agreement also provides for replacing a Servicer, both with and without cause.

30.    Christiana Trust, as Owner Trustee, owed duties to the Indenture Trustee for the benefit of the Noteholders under the Servicing Agreement.  Christiana Trust, as Indenture Trustee, also owed duties directly to the Noteholders under the Servicing Agreement.

**E.    Matthew Browndorf First Misappropriates Mortgage Assets.**

31.    Browndorf was an attorney licensed to practice law in New York, Pennsylvania and New Jersey.  Browndorf also owned and controlled a variety of businesses, including, without limitation, a business known as Plutos Sama, LLC ("Plutos Sama").  Browndorf was the Chief Executive Officer of Plutos Sama.

32.    Plutos Sama, in turn, owned the BP Fisher Law Group, LLP ("BP Fisher").  BP Fisher was a law firm that represented lenders and mortgage loan servicers in foreclosure and default actions.  The proceeds from these actions were deposited into BP Fisher's client trust accounts, which were then supposed to be distributed to clients.

33.    On March 8, 2017, SLS retained BP Fisher to provide foreclosure and default related legal services in connection with the processing of foreclosure, bankruptcy and/or eviction actions related to the Mortgage Loans.

34.    BP Fisher was obligated under its agreement with SLS to distribute any funds that it collected on SLS's behalf from the sale of a foreclosure property on a timely basis.  Nevertheless, in 2017 and 2018, BP Fisher collected funds from foreclosures relating to six of the Trust's

9

Mortgage Loans totaling approximately $1.7 million, but never provided those funds to SLS.  SLS reiterated its request to Browndorf to remit the proceeds.  Browndorf assured SLS that the proceeds would be submitted.  But they never were.

35.     Upon information and belief, Browndorf misappropriated those funds for, among other things, his own personal use.  Indeed, on August 19, 2022, Browndorf was indicted on charges of wire fraud and money laundering relating to BP Fisher.  The United States Attorney for the District of Maryland (where BP Fisher was located) alleges in its indictment that once proceeds of the foreclosures were deposited into BP Fisher's trust account, Browndorf transferred or directed the transfer of those funds out of the trust account and into other accounts that Browndorf controlled, when those funds should have been paid to BP Fisher's clients.  The U.S. Attorney further claims that Browndorf allegedly used the stolen funds to pay for his personal expenses, the personal expenses of family members, or expenses incurred by Plutos Sama.  The indictment further alleges Browndorf stole more than $3.9 million from BP Fisher's clients.

36.     Before his indictment, Browndorf caused BP Fisher to file a voluntary petition under Chapter 11 of Title 11 of the United States Code, initiating bankruptcy proceedings in United States Bankruptcy Court for the Central District of California, Santa Ana Division on January 19, 2019 (the "BP Fisher Bankruptcy").

37.     SLS in its capacity as Servicer for the Trust, filed a proof of claim against the debtor's estate, in the amount of approximately $1.7 million, representing the value of the six Mortgage Loans that BP Fisher foreclosed, but for which Browndorf never remitted the proceeds.

38.     Thus far, the Trust has not received any payment relating to the six Mortgage Assets that Browndorf allegedly misappropriated for his own personal use.

**F.**     **The Owner Trustee and Indenture Trustee Obtain Knowledge of Browndorf's Fraud.**

39.     In May 2020, upon information and belief, to gain a personal financial advantage in the BP Fisher Bankruptcy, Browndorf caused DCM-P1 to direct Christiana Trust to terminate SLS (and Statebridge Company LLC ("Statebridge"), the successor servicer to Rushmore) without cause and install DCM-P1's own managing member, Distressed Capital Management, LLC ("DCM"), as sole Servicer for the Trust.  DCM was owned and controlled by Browndorf.

40.     On May 7, 2020, Christiana Trust sent SLS a letter purportedly notifying SLS that the Trust was terminating SLS's services without cause effective 90 calendar days from the termination letter.

41.     On June 18, 2020, SLS responded to the May 7 letter.  SLS addressed its letter to Christiana Trust to the address identified for the Indenture Trustee in Section 10.04 of the Indenture regarding notices.  As a preliminary matter, SLS noted that Browndorf did not follow the protocol required under the Trust Agreement.  Notice should have come from Christiana Trust, but Browndorf emailed the letter to SLS's counsel in the BP Fisher Bankruptcy.  Moreover, SLS expressed to Christiana Trust that it had "grave concerns" regarding the Issuer's compliance—meaning Christiana Trust's compliance since it acted on behalf of the Issuer—with the terms of the Servicing Agreement in its recognition of DCM as the successor servicer.

42.     To that end, the June 18, 2020 letter notified Christiana Trust that DCM was not qualified to serve as a successor Servicer because it did not meet any of the qualifications of a Servicer under Section 7.04 of the Servicing Agreement.  Section 7.04 requires a servicer to "(i) be a HUD approved servicer and (ii) have a net worth of at least $10,000,000.  In addition, any successor Servicer must be acceptable to the Seller (as evidenced by its written consent)."  SLS further notified Christiana Trust that the fact that DCM does not satisfy the requirements for a successor Servicer under the Servicing Agreement was compounded by the fact that the party

11

directing the appointment of DCM as successor Servicer, DCM-P1, is a DCM affiliate and, upon information and belief, Browndorf controlled both.

43.     SLS explicitly explained to Christiana Trust its concern that Browndorf himself was responsible for the concealment and misappropriation of the Mortgage Assets.  It further warned, "**SLS is concerned that the Majority Certificateholder [Browndorf-controlled DCM-P1] appointed DCM as successor Servicer in furtherance of Mr. Browndorf's efforts to conceal and misappropriate Mortgage Assets to the detriment of SLS, the Issuer and the Noteholders**."

44.     As noted above, while the Majority Certificateholder has the right to direct Christiana Trust to take action in certain circumstances, Christiana Trust is ***not*** required to heed those directions, nor are the directions unfettered and without limitation.  Indeed, "the Majority Certificateholder's right to direct the Trust shall be limited to actions in furtherance of the transactions contemplated by the Indenture and the Servicing Agreement."  Trust Agreement Section 2.03(vi).  SLS succinctly and plainly explained how the Owner Trustee's appointment of an unqualified successor Servicer is not in furtherance of the transaction of replacing a Servicer without cause under the Servicing Agreement.

45.     Thus, as of June 18, 2020, Christiana Trust had knowledge that: (1) DCM was not qualified to be Servicer; (2) Browndorf and his affiliate BP Fisher had already committed a fraud on the Trust; (3) Browndorf and his affiliates were likely to use DCM's position as Servicer conceal and misappropriate Mortgage Assets to the detriment of the Noteholders; and (4) Christiana Trust's appointment of DCM as Servicer was a breach of the Servicing Agreement.

46.     By letter dated August 6, 2020, Christiana Trust, acting at Browndorf's direction, nevertheless confirmed to SLS its intention to replace SLS with Browndorf-controlled DCM.  This

letter made no mention of the concerns raised by SLS about DCM; instead it appears that Christiana Trust completely ignored them.

47.     Still concerned, in or around late September 2020, SLS again wrote to Christiana Trust, noting that it continued "to have grave concerns regarding the Issuer's compliance with the terms of the Servicing Agreement in recognition of DCM as the successor Servicer."  In so doing, SLS provided specific evidence regarding the untruthfulness of DCM-P1's assertions concerning DCM's eligibility and its concerns regarding DCM's attempts to thwart SLS's requests for relief on behalf of the Trust in a bankruptcy proceeding filed by BP Fisher.  Therefore, Christiana Trust again was aware—both as Owner Trustee and Indenture Trustee—that appointment of DCM as Servicer was a breach of the Servicing Agreement in a manner that would be detrimental to the Noteholders.

48.     Christiana Trust declined to act on SLS's specific evidence that DCM was not qualified and was being dishonest.  Christiana Trust further ignored the fact that its installation of an unqualified, dishonest servicer at the direction of someone who already had stolen funds from the Trust was a breach of the Servicing Agreement and that such breach was likely to result in further misappropriation of Mortgage Assets to the detriment of the Noteholders.

49.     Christiana Trust further failed to act on SLS's warning that DCM intended to withdraw the SLS's proof of claim concerning $1,731,207.67 Mortgage Assets in the BP Fisher Bankruptcy, which would deprive the Trust of funds that were collected and owed to it.

**G.     Christiana     Trust     Begins     Actively     Assisting     Browndorf     and     DCM
in the Fraudulent Scheme.**

50.     Christiana Trust, based on SLS's letters and the evidence cited therein, knew that
Browndorf and DCM-P1 wanted to install an unqualified DCM as successor Servicer to
misappropriate Mortgage Assets.  Christiana Trust then shockingly proceeded to actively assist
Browndorf and DCM-P1 in doing *exactly that*, demonstrating a profound indifference to the rights
and interests of the Trust and the Noteholders that it was obligated to protect.  As is further
described below, Browndorf and his related entities, in active concert and participation with
Christiana Trust, intentionally decimated the Trust Estate for the sole benefit of Browndorf and
his related entities and to the detriment of the Noteholders.

51.     It was gross negligence and bad faith, or, in the alternative, willful misconduct for
Christiana Trust, as both Owner Trustee and Indenture Trustee, to ignore evidence demonstrating
that DCM was not qualified and should not serve as Servicer and, nevertheless, fire qualified
Servicers and appoint DCM to that role.  Indeed, SLS presented evidence that DCM was not HUD
approved, despite DCM-P1's representations to the contrary.  It was also gross negligence and bad
faith, or, in the alternative, willful misconduct for Christiana Trust, as both the Owner Trustee and
Indenture Trustee, to ignore the specific entreaties of the current Servicer, SLS, who presented
evidence that Browndorf already had misappropriated and concealed Trust assets and was likely
to continue to do so.  And it was gross negligence and bad faith, or, in the alternative, willful
misconduct for Christiana Trust to install DCM as servicer when it had proof that the proposed
Servicer had been dishonest about its qualifications.

52.     DCM followed through on the very action about which SLS warned Christiana
Trust.  Upon information and belief, the United States Bankruptcy Trustee in the BP Fisher
bankruptcy proceeding identified a limited fund of money, which was earmarked to be used to pay

proofs of claim, including to clients like SLS for whom BP Fisher collected foreclosure proceeds but failed to remit.

53.     Upon information and belief, Browndorf agreed to personally guarantee the return of funds to SLS as Servicer beyond those available to the Bankruptcy Trustee.  Upon information and belief, SLS warned Christiana Trust that, once appointed, DCM would seek to withdraw SLS's claim on behalf of the Trust to lessen Browndorf's personal liability.

54.     Despite Christiana Trust's awareness of the BP Fisher Bankruptcy and SLS's concerns regarding DCM's potential to further divert funds from the Trust, Christiana Trust, as Owner Trustee, still appointed DCM.  Christiana Trust, as Indenture Trustee, knowingly allowed the Owner Trustee to appoint DCM as Servicer when it knew that such appointment was a breach of the Servicing Agreement.  And Christiana Trust sat idly by as DCM then sought to divert funds in the BP Fisher Bankruptcy away from the Trust for the benefit of Browndorf.

55.     Christiana Trust, at a minimum grossly negligently, but more likely willfully given its knowledge as described above, failed to require DCM pursue the best interests of the Trust and the Noteholders in the BP Fisher bankruptcy proceeding.  As SLS predicted, DCM sought to have SLS's claim for the Trust transferred to itself.[3]  As a result of Christiana Trust's (as both Owner Trustee and Indenture Trustee) grossly negligent and bad faith failure to comply with the Transaction Documents, the Trust and the Noteholders have been injured, including without limitation, incurring additional fees through SLS and its counsel.  Christiana Trust's actions further ensured that qualified Servicers were not servicing the properties underlying the Mortgage Loans

---

[3] When Prophet discovered that DCM was attempting to divert BP Fisher Bankruptcy funds away from the Trust, it directed Christiana Trust to rescind DCM's appointment as Servicer.  Upon information and belief, but for Prophet's direction, DCM still would be pursuing its course of action today, putting into jeopardy over $700,000 of the missing $1.7 million that Prophet understands may soon being made available to the Trust through the BP Fisher Bankruptcy.

properties or generating cash flows for the benefit of the Noteholders.  Instead, Christiana Trust's actions made sure that the Mortgage Loans were available to Browndorf to abscond.

## H.    The    Owner    Trustee    and    Indenture    Trustee    Failed    to Require DCM to Service the Loans.

56.    Once DCM became Servicer, Christiana Trust, grossly negligently, or, alternatively, willfully and in bad faith, failed to enforce the Servicing Agreement.  Section 3.01(a) of the Servicing Agreement required DCM to service and administer the Mortgage Assets in accordance with "Accepted Servicing Practices."   Section 7.04 of the Servicing Agreement required DCM to assume the servicing obligations "as soon as practicable."  DCM did neither.  In July 2022, Prophet had a telephone conference with Browndorf in an effort to locate the Trust's servicing files.  In that conversation, Browndorf informed Prophet that DCM did not have any servicing files because DCM never serviced a single loan in the time it served as Servicer.  Thus, DCM failed to comply with Sections 3.01(a) and Section 7.04, but Christiana Trust did nothing.

57.    Christiana Trust was on notice that DCM was not qualified to be Servicer and that the reason DCM wanted to become Servicer was not to service the Mortgage Loans, but to misappropriate them to the detriment of the Trust and the Noteholders.  Christiana Trust, by virtue of its knowledge of the Trust's remittance reports and the lack of cash flows once DCM became Servicer, knew or had information such that it should have known that DCM was not servicing the loans.  Indeed, the only payments that the Trust's remittance reports reflect being made to the Trust during the time DCM was Servicer was a monthly $161,932.86 interest payment.   And all payments ultimately stopped during DCM's term as Servicer, which was an Event of Default.

58.    Christiana Trust, both as the representative for the Issuer as Indenture Trustee, had an obligation under Section 7.01 of the Servicing Agreement to notify DCM that it was failing to observe and perform its duties in any material respect and declare an Event of Default if such

failure continued for thirty days.  Christiana Trust's failure to notify DCM that it was not properly servicing the Mortgage Loans, is, at a minimum, gross negligence, particularly because it was on notice that DCM was not qualified and sought an appointment as Servicer for an improper purpose.

59.     Christiana Trust should have notified DCM that it failed as Servicer and, had DCM's performance not improved, terminated DCM's services for cause and installed a qualified Servicer.  By failing to take this action, Christiana Trust caused the Trust and the Noteholders damages.

## I.     Christiana Trust Actively Helped Browndorf Misappropriate More than 60 Loans.

60.     Unfortunately for the Noteholders, Christiana Trust did not simply stand by and let an unqualified Servicer do nothing.  Instead, Christiana Trust began helping Browndorf misappropriate Mortgage Loans or proceeds therefrom that, upon information and belief, Browndorf used to finance his lavish $100,000 per month lifestyle.  On August 31, 2021, Christiana Trust—acting at the specific direction of DCM-P1, Browndorf's affiliate—sold 14 Mortgage Loans to another Browndorf affiliate, LNREPO 2011 LLC, for a purchase price of $3 million (the "August Fraudulent Sale").  Thereafter, on November 10, 2021, Christiana Trust sold another 48 Mortgage Loans to the LNREPO 2011 LLC Browndorf affiliate for a purchase price of $6,632,721.05 (the "November Fraudulent Sale," and collectively with the August Fraudulent Sale, the "Fraudulent Sales").  Upon information and belief, these Mortgage Loans were worth far in excess of $10 million.

61.     Shockingly, in exchange for the sales, the Trust received ***no cash***.  Instead, the terms of the Fraudulent Sales included a one-year balloon promissory note from the Browndorf-related entity that, upon information and belief, provided Browndorf (through his affiliate) with an option to then issue yet another promissory note.  These terms do not comply with the Transaction Documents, nor pay the Notes pursuant to the Transaction Documents, nor in any way benefit the

17

Noteholders. Nevertheless, Christiana Trust specifically agreed to these terms. Notably, the same employee at Christiana Trust who executed the sale documents, Shaheen Mohajer, served as Christiana Trust's representative as both Owner Trustee and Indenture Trustee. Thus, the Indenture Trustee was aware of the Fraudulent Sales and did nothing to stop them or otherwise protect the Noteholders.

62.     These Fraudulent Sales violated Section 8.06 of the Indenture, which requires a sale of one or more Mortgage Loans to be to an unaffiliated third party in an arm's length transaction. The Fraudulent Sales were not to an unaffiliated party, nor were they arm's length transactions. Instead, the Owner Trustee sold the Mortgage Loans to a company called LNREPO 2021 LLC (another Browndorf-controlled entity), which is an affiliate of both DCM-P1, the Majority Certificateholder, and DCM, the Servicer.

63.     The terms of the Fraudulent Sales further confirm that they were not arm's length transactions, as they benefitted only Browndorf's entities and, upon information and belief, were not anywhere approaching market terms. Both sales conveyed millions of dollars of Mortgage Loans to LNREPO 2021 LLC, but by design provided zero proceeds from those sales to the Trust or the Noteholders. As mentioned above, in exchange, LNREPO 2021 LLC gave a one-year balloon promissory note with the right, at the end of the year, to issue another promissory note for equal installments paid over five more years. An insider deal with the ability to delay payments on over half of the Mortgage Loans comprising the Trust Estate for six years, in a market with rising sale prices, limited inventory, fast-paced real estate sales, and low mortgage rates, is not arm's length. That Christiana Trust willingly signed over these 48 Mortgage Loans is simply astonishing and reflects a profound indifference to the rights and interests of the Noteholders that it was obligated to protect. And that Christiana Trust, as the Indenture Trustee, knew about it and

did nothing is equally astonishing.

64.     The Fraudulent Sales also violated Section 3.03 of the Indenture, the waterfall, which provides that Noteholders are to be paid in full before Certificateholders receive any funds. However, the only entity to receive funds from the Fraudulent Sales of Mortgage Loans was LNREPO 2011 LLC, which, upon information and belief is an alter ego of both Browndorf and DCM-P1, the Majority Certificateholder.  Thus, upon information and belief, the Fraudulent Sales allowed Certificateholders to receive the benefit of the Mortgage Loans before Noteholders.

65.     The Fraudulent Sales also violated Section 3.06(iv) of the Indenture.  The Indenture is clear that, so long as any Notes are Outstanding, the Issuer (and, therefore, Christiana Trustee as Owner Trustee acting on its behalf) shall not, except as expressly permitted by a Transaction Document, impair or cause to be impaired the Issuer's interest in the Mortgage Loans if any such action would materially and adversely affect the interests of the Noteholders.  However, by its actions, Christiana Trust—at Browndorf's direction—knowingly, willfully, and/or at a minimum grossly negligently impaired the interest in the 48 Mortgage Loans in a manner that materially and adversely affected the interests of the Noteholders.  By way of example only, conveying Mortgage Loans subject to a promissory note to an entity without performing any due diligence on—much less even asking—whether the purchaser has an ability to repay it is an impairment of the Mortgage Loans that materially and adversely affects the interests of the Noteholders.

66.     LNREPO 2011 LLC does not have the ability to repay the promissory note.  Upon information and belief, a balloon payment for the August Fraudulent Sale was due on or before August 31, 2022, and has not been received.  Nor have any payments in respect of the loans been received, nor, upon information and belief, has the Owner Trustee received any communication regarding the August Fraudulent Sale from LNREPO 2021 LLC.  Accordingly, upon information

and belief, LNREPO 2021 LLC is in default of the purchase agreement underlying the August Fraudulent Sale.

67.     Upon information and belief, the Owner Trustee, nevertheless, failed to identify where those assets are or whether there is any recourse available for the Trust.  The Owner Trustee, upon information and belief, has failed to act, despite the fact that, as is described below, an Event of Default was declared and there have been no cash flows to the Trust for almost an entire year.

68.     That the Owner Trustee has undertaken no steps to seek to recover on a defaulted agreement is at a minimum grossly negligent or, alternatively, willful misconduct.  Christiana Trust should have immediately taken action to protect the Trust Estate upon default, including without limitation pursuing the Trust's rights in the bankruptcy proceeding that Browndorf's wife filed, in which she has alleged that any assets owned by LNREPO 2021 LLC are one-half hers under community property rules.  Christiana Trust is aware of this proceeding but, based upon the fact that there is default judgment against the Trust therein, has actively refused to participate.  Christiana Trust also informed Prophet in May 2022 that it had not hired counsel to monitor any of Browndorf-related bankruptcies to "save money" for the Trust.  Such failure to engage counsel to assess potential recoveries and options is also either grossly negligent or, alternatively, willful misconduct, particularly in light of the fact that the Trust is in default.

**J.     The Owner Trustee and Indenture Trustee Fraudulently Misrepresented the November Fraudulent Sale.**

69.     On November 2, 2021, a "Responsible Officer" of the Indenture Trustee (defined in the Indenture as "any officer of the Indenture Trustee . . . with direct responsibility for the administration of the Indenture") obtained actual notice of an Event of Default or a potential Event of Default.  The Indenture Trustee notified the Owner Trustee, who confirmed an Officer's Certificate dated November 8, 2021 (the "Officer's Certificate") that an Event of Default had, in

fact, occurred.  The Owner Trustee intended that the Indenture Trustee would notify the Noteholders, which it did.  Specifically, that same day, the Indenture Trustee provided notice to the Noteholders of an Event of Default.

70.     The notice provided to the Noteholders contained a copy of the Officer's Certificate.  The Officer's Certificate stated specifically that the Issuer failed to pay full interest and that the "status of the occurrence of the Event of Default is being cured by a loan sale."

71.     However, Christiana Trust knew that the November Fraudulent Sale would not cure the Event of Default before it notified the Indenture Trustee of the November Fraudulent Sale. Indeed, on November 5, 2021, Browndorf-controlled DCM-P1, as Majority Certificateholder and Browndorf-controlled DCM executed a direction letter to Christiana Trust to enter into the November Fraudulent Sale.  As in August, the November Fraudulent Sale was conveying loans to LNREPO 2021 LLC.  The Terms of the November Fraudulent Sale to which Christiana Trust readily agreed included that "[t]he amount to be deposited into the Payment Account on the Closing Date is **$0**, gross of reimbursable deal expenses of **$0**."  (Emphasis in original.)

72.     Thus, Christiana Trust clearly knew on November 5, 2021—three days before issuing the Officer's Certificate representing that "the Event of Default is being cured by a loan sale"—that not a single dollar of the $6,632,721.05 purchase price would be paid to the Payment Account and, therefore, to the Noteholders as required by the Transaction Documents. Nevertheless, Christiana Trust made these material misrepresentations, which it then provided to the Indenture Trustee to be included in a notice to Noteholders.  This misrepresentation that loans would be sold to cure the Event of Default severely damaged the Noteholders and the Trust Estate.

73.     Indeed, given that the same person at Christiana Trust, Shaheen Mohajer, was Christiana Trust's representative for both the Owner Trustee and the Indenture Trustee and he

signed the November Fraudulent Sale transaction documents for Christiana Trust, the Indenture Trustee also knew that loans were not being sold to cure the Event of Default. Nevertheless, Mr. Mohajer and Christiana Trust sent a notice to the Noteholders on November 8, 2021 knowingly falsely stating that loans were being sold to cure the Event of Default.

74.     As with the August Fraudulent Sale, LNREPO 2011 LLC does not have the ability to repay the November promissory note. Upon information and belief, a balloon payment for the November Fraudulent Sale was due on or before November 10, 2022, and has not been received. Nor have any payments in respect to the loans been received, nor, upon information and belief, has the Owner Trustee received any communication regarding the November Fraudulent Sale from LNREPO 2021 LLC. Accordingly, LNREPO 2021 LLC is, upon information and belief, in default of the purchase agreement underlying the November Fraudulent Sale.

75.     Upon information and belief, Christiana Trust, nevertheless, has done nothing to identify where those assets are or whether there is any recourse available for the Trust. Christiana Trust has failed to act, even though, as is further described below, an Event of Default has been declared and there have been no cash flows whatsoever to the Trust for almost an entire year. That Christiana Trust has taken no steps to seek to recover on a defaulted agreement, at a minimum, is grossly negligent, but more likely is willful misconduct. Christiana Trust should have taken immediate action to protect the Trust Estate upon default, including without limitation pursuing the Trust's rights in the bankruptcy proceeding that Browndorf's wife filed, in which she has alleged that any assets owned by LNREPO 2021 LLC are one-half hers under community property rules. As stated above, Christiana Trust is aware of this proceeding but allowed a default judgment against the Trust.

**K.**     **The Owner Trustee Misrepresented the Mortgage Assets in the Trust.**

76.     The Owner Trustee's and Indenture Trustee's fraud—and aiding and abetting Browndorf's and his related entities, including DCM-P1's, fraud—does not stop there. The October 25, 2021 remittance report denotes that the Trust held 74 Mortgage Loans as assets. The November 26, 2021 remittance report denotes that the Trust held 72 Mortgage Loans as assets. And the remittance reports through October 2022 continue to represent to the Noteholders that the Trust has 72 Mortgage Loans. However, based upon the Fraudulent Sales, it is all but impossible that there are anywhere near 72 Mortgage Loans in the Trust. Indeed, upon information and belief, as of the time of this Complaint, Christiana Trust holds record title to only approximately 12 of the Trust's Mortgage Loans, some of which could still have been sold with Christiana Trust temporarily retaining title.

77.     That Christiana Trust actively participated in "sales" of the Mortgage Loans but continued and continues to allow the Paying Agent to circulate monthly remittance reports to the Noteholders that such loans had not been sold is astounding. The Indenture Trustee, by virtue of Mr. Mohajer serving in a dual role, also knew that Christiana Trust had sold loans but failed to report it to the Noteholders. The Noteholders have relied upon the remittance reports to their detriment. Indeed, had they known in September 2021 that Browndorf and his affiliates had begun to convey Mortgage Assets for no value, they might have been able to stop his activities.

**L.**     **The Owner Trustee's Appointment of DCM Gave Browndorf Unfettered Access to Mortgage Loans.**

78.     Finally, SLS's admonition to Christiana Trust came to pass in one additional manner: Prophet discovered that Browndorf had independently fraudulently conveyed Mortgage Loans by forging the Owner Trustee's name and power of attorney. Christiana Trust was grossly negligent and/or engaged in willful misconduct in allowing Browndorf and DCM access to

23

Mortgage Loans and deeds when it was fully aware that he had been engaged and was likely to be engaged in misappropriating assets.

**M.**    <u>The Indenture Trustee Failed to Timely Provide Notices of Default</u>.

79.    The Indenture defines an "Event of Default" as, among other things:

> a default by the Issuer in the observance of any negative covenant in the Indenture or any representation or warranty made by the Issuer in the Indenture or in the Note or other writing delivered pursuant thereto having been incorrect as of the time made, which default or breach has a material adverse effect on the Noteholders, and the continuation of any such default for a period of thirty (30) days after notice to the Issuer by the Indenture Trustee or by the Holders of at least 25% Percentage Interest of each Class of Notes, voting separately, as applicable.

Indenture, Appendix A at p. 7.

80.    Section 3.06(iv) of the Indenture requires that, so long as any Notes are Outstanding, the Issuer shall not, except as expressly permitted by a Transaction Document, impair or cause to be impaired its interest in the Mortgage Loans, the REO Properties or the transaction Documents if any such action would materially and adversely affect the interests of the Noteholders.

81.    An Event of Default occurred at least as early as August 31, 2021.[4]  Specifically, on that date, the Issuer sold Mortgage Loans in exchange for a promissory note from an entity that was not creditworthy and had no ostensible means of paying the Trust.  Accordingly, the Issuer caused its interest in the Mortgage Loans that were the subject of the August Fraudulent Sale to be impaired, which impairment materially and adversely impacted the interests of the Noteholders.  Such action materially and adversely impacted the interests of the Noteholders because, among other things, such a transaction severely impaired the Noteholders' right to be paid from Mortgage

---

[4] Among other things, DCM's failure to service the Mortgage Loans, much less in accordance with Accepted Servicing Practices, may have constituted an earlier Event of Default.

Loans that secured the Notes.

82.     Section 6.05 of the Indenture requires the Indenture Trustee to "promptly mail to each Noteholder notice of the Event of Default after a Responsible Officer of the Indenture Trustee has actual knowledge thereof or written notice of such Event of Default is received by a Responsible Officer of the Indenture Trustee and such notice references the Notes, the Trust Estate or this Indenture, unless such Event of Default shall have been waived or cured."

83.     A Responsible Officer of the Indenture Trustee had actual knowledge of the Event of Default.  Mr. Mohajer is a Vice President and, therefore, an officer of Christiana Trust.  He also has direct responsibility for the administration of the Indenture.  Mr. Mohajer also is the person who signed the agreement on behalf of the Owner Trustee selling the Mortgage Loans in the August Fraudulent Sale, so and the Indenture Trustee he had actual knowledge of the Event of Default.  The Indenture Trustee, however, failed to provide notice of the Event of Default.

**N.     The Indenture Trustee Has Owed a Fiduciary Duty Since at Least August 31, 2021.**

84.     Under the Agreement and applicable law, the Indenture Trustee owed a fiduciary duty to Noteholders upon the occurrence of an Event of Default.  Under Section 6.01 of the Indenture, if an Event of Default has occurred and is continuing, the Indenture Trustee must exercise the rights and powers vested in it by the Indenture and use the "same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs."

85.     The duty to act prudently to protect the interests of Noteholders is a continuing duty that remains in effect until the Event of Default is cured.

86.     Christiana Trust has not acted prudently since at least August 31, 2021, if not before.

87.     Christiana Trust had a contractual and legal duty upon an Event of Default—and

certainly after it declared an Event of Default in November 2021—to exercise the rights and powers vested in it by the Agreement, and to use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.  In line with this duty, upon the Event of Default, Christiana Trust should have acted to protect Mortgage Assets.  It has not.

88.     Among other things, Christiana Trust knowingly allowed DCM to continue "servicing" the loans as Servicer, when it was aware that DCM clearly was not servicing anything (as evidenced by the fact that not a single dollar has been paid into the Payment Account since October 2021).  To that end, Christiana Trust should have terminated DCM and appointed a new Servicer as soon as possible.

89.     A prudent person also would have undertaken to understand what assets remain in the Trust, whether any Mortgage Assets had been fraudulently conveyed without Christiana Trust's knowledge and consent and undertaken to determine if there is any recourse to regain the property or otherwise receive remuneration from anyone relating thereto.  Upon information and belief, Browndorf may have fraudulently conveyed 11 of the Trust's Mortgage Loans in 2022. Upon information and belief, Christiana Trust has done nothing.  Indeed, Prophet is the one who notified Christiana Trust of Browndorf's forged conveyances.  Yet, upon information and belief, Christiana Trust has no idea what Mortgage Assets remain in the Trust.

90.     To that end, a prudent person also would undertake a review of its remittance reporting to confirm it is accurate and, if not, seek to correct it.  The Trust's remittance reports from at least September 2021 are believed to be wildly inaccurate and make false representations regarding the assets in the Trust.

91.     A prudent person also would have responded to legal process and taken steps to

protect Trust assets by non-Noteholders.  Since declaring an Event of Default, Christiana Trust has knowingly failed to respond to legal process directed to the Trust on more than one occasion, resulting in at least one default judgment against the Trust.

**O.      Christiana Trust Failed to Protect the Trust Due to Its Conflict of Interests.**

92.     As Indenture Trustee, Christiana Trust has an unwaivable duty to avoid conflicts of interest and act in the interest of Noteholders.  Under the Transaction Documents, Christiana Trust occupies the role of Indenture Trustee and Owner Trustee.  Each of these positions, in turn, give rise to different duties with different stakeholders.  As a result, these two roles are irreconcilably conflicted.  For example, the Majority Certificateholder—owned and controlled by Browndorf— has now on at least three occasions directed Christiana Trust to engage in activities that benefit Browndorf and the affiliates he controlled, including DCM-P1 but are a detriment to the Trust Estate, the Collateral and the Noteholders.  These three occasions include accepting directions from DCM-P1 to terminate SLS and Statebridge and install an unqualified DCM as Servicer, to enter into the August Fraudulent Sale and to enter into the November Fraudulent Sale.

93.     Rather than recognize this inherent conflict and resign one (or more) of its roles, Christiana Trust instead ignored this conflict, pretending not to have had knowledge or notice of troubling events and disclaiming any duty to protect the Noteholders.  Christiana Trust cannot plausibly disclaim knowledge of, for example, the terms of the Fraudulent Sales, because the same person—Mr. Mohajer—is the one who signed the sale documents and acts on behalf of both the Owner Trustee and the Indenture Trustee.  Similarly, Christiana Trust cannot claim that its hands were tied as Owner Trustee and was entitled to fully accept, without proof, DCM-P1's representations regarding the fact that it stepped into the shoes of the Seller, that DCM had $10,000,000 in assets, and that DCM was a HUD-approved servicer.  Upon information and belief, none of them are true.  Even so, when confronted with the evidence that Browndorf is a fraudster

and had lied in his representations to the Owner Trustee, Christiana Trust did nothing as either an Owner Trustee or an Indenture Trustee.  An Indenture Trustee without a conflict who knew those facts, upon information and belief, decidedly would have behaved differently.

**P.      Christiana Trust's Conduct Injured Prophet and the Other Noteholders.**

94.      Prophet, the other Noteholders and the Trust have incurred substantial damages attributable to Christiana Trust's breaches of its contractual, statutory, and common law duties. Had Christiana Trust performed its contractual, statutory, and common law duties, it would have acted to prevent Browndorf from misappropriating more than $40 million collateral value of Mortgage Assets—including principal as well as applicable interest and fees—without providing any value to the Trust.  It also would have acted swiftly to protect Trust assets upon declaring an Event of Default.  Christiana Trust breached its contractual, fiduciary, and statutory duties by failing to act prudently and take these, and other, actions.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

95.      Prophet owns Notes with an original face value of over $100 million.  Specifically, Prophet holds 82% of the Class A Notes and 100% of the Class M Notes in the Trust.

96.      Prophet brings certain of the claims set forth below derivatively, in the right and for the benefit of the Indenture Trustee and RBSHD 2013-1 to redress injuries suffered by the Noteholders and RBSHD 2013-1 as a result of the breaches of contract and other violations of law by Christiana Trust as Owner Trustee.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

97.      Prophet will adequately and fairly represent the interests of the Noteholders and RBSHD 2013-1 and the other Noteholders in enforcing and prosecuting their rights.  At all times, Prophet has acted equitably and in good faith, without any ulterior motive, and in the belief that RBSHD 2013-1 is entitled to the relief sought on its behalf.

98.     As evidence of its adequacy and fairness of representation and good faith, previously Prophet directed the Indenture Trustee to direct the Owner Trustee to rescind DCM's servicing rights and to ensure that DCM withdraws its objection to SLS's proof of claim in the BP Fisher Bankruptcy.   As a result, available funds from that legal proceeding, which upon information and belief will exceed $700,000, are anticipated to flow to the Trust vis-à-vis the waterfall for the benefit of all Noteholders and will not just benefit Prophet.

99.     The Indenture affords Prophet the right to sue derivatively upon 60 days' notice to Christiana Trust as Indenture Trustee.  Prophet is excused from making a pre-suit litigation demand because such demand would be futile.  Such notice would request Christiana Trust, as Indenture Trustee, sue Christiana Trust, as Owner Trustee.  Because Christiana Trust itself faces liability for the claims set forth herein, any such demand would be futile.  Put more simply, Prophet need not make a demand on Christiana Trust to sue itself, as it would be absurd to expect Christiana Trust would do so.

100.     Moreover, the Indenture Trustee also is incapable of making an independent and disinterested decision to institute a proceeding.   As is described herein, Christiana Trust as Indenture Trustee exhibited a sustained and systematic failure to fulfill its contractual, common law, and statutory duties that ultimately led to the unauthorized diversion of collateral and wrongful conduct that is the subject of this action.

101.     Additionally, because Prophet has a supermajority of voting interests, it would be futile to afford other Noteholders an opportunity to issue a counter direction not to sue, as no other Noteholder or group of Noteholders can reach a majority of voting interests.

102.     Accordingly, Prophet has satisfied the requirements of the Indenture to file this suit because any notice requirement is futile.

**FIRST CAUSE OF ACTION**
**Breach of Contract: Breach of the Indenture**
**(Brought by Prophet both Individually and Derivatively on Behalf of the Indenture Trustee and RBSHD 2013-1)**

103.    Prophet incorporates the allegations contained in paragraphs 1 through 102 as if set forth fully herein.

104.    The Indenture is a valid and enforceable contract between the Issuer, the Paying Agent and Christiana Trust.

105.    As a Noteholder of RBSHD 2013-1, and derivatively on behalf of the Indenture Trustee and RBSHD 2013-1, Prophet is entitled to assert any legal or equitable right, remedy or claim under the Indenture and is a third-party beneficiary under the Indenture.

106.    Prophet has performed its obligations under the Indenture.

107.    Christiana Trust breached its obligations as Indenture Trustee under the Indenture.

108.    The Indenture provides, among other things, the terms on which Christiana Trust acts as the Indenture Trustee of the RBSHD 2013-1 Trust Estate and Collateral for the benefit of the Noteholders.

109.    For example, Section 3.06(iv) of the Indenture obligates the Trust (as Issuer) to not:

> waive or impair, or fail to assert rights under, the Mortgage Loans or, the REO Properties, or impair or cause to be impaired its interest in the Mortgage Loans, the REO Properties or the Transaction Documents if any such action would materially and adversely affect the interests of the Noteholders.

110.    Among other things, Christiana Trust knew that the August Fraudulent Sale did not comply with the negative covenants of Section 3.06(iv) of the Indenture, but nonetheless did not timely declare an Event of Default.  It also failed to act as a reasonably prudent person would following an Event of Default, including undertaking to protect Mortgage Assets, engage a qualified Servicer (or even one that would service the Mortgage Loans), and determine what of

the Trust Estate still remained. Christiana Trust further failed to enforce the Owner Trustee's breaches under the Indenture.

111. Christiana Trust further breached its negative covenants of Section 3.06(iv) of the Indenture by entering into the Fraudulent Sales when those sales impaired the Mortgage Loans in a manner that materially and adversely impacted the interests of the Noteholders.

112. Christiana Trust also breached its obligations as Owner Trustee under the Servicing Agreement and Indenture. For example, Section 8.06 on the Indenture states that while the Trust as Issuer may "sell one or more Mortgage Loans to unaffiliated third parties in arm's length transactions at any time without restriction so long as such sale would result in a benefit to the holders of the Trust Certificates of the Issuer."

113. Among other things, Christiana Trust effectuated and executed the Fraudulent Sales when it knew that such transactions were not with an unaffiliated party or arm's length.

114. Christiana Trust, as Owner Trustee and Indenture Trustee further failed, upon information and belief, to enforce the terms of the August Fraudulent Sale when LNREPO 2021 LLC neither made a balloon payment nor issued additional promissory notes, nor made any payments thereunder.

115. As a direct result of Christiana Trust's breaches of the Indenture, Prophet and the other Noteholders have been damaged in an amount of the loss of their shares of income that they would have been entitled to had Christiana Trust not allowed Browndorf and his affiliates to abscond with, upon information and belief, in excess of $40 in collateral value of Mortgage Assets without providing any value to the Trust.

## SECOND CAUSE OF ACTION
### Breach of Contract:  Breach of the Trust Agreement
### (Brought by Prophet both Individually and Derivatively on Behalf of the Indenture Trustee and RBSHD 2013-1)

116.    Prophet incorporates the allegations contained in paragraphs 1 through 115 as if set forth fully herein.

117.    The Trust Agreement is a valid and enforceable contract between Christiana Trust, the Depositor and the Paying Agent.

118.    As a Noteholder of RBSHD 2013-1, and derivatively on behalf of the Indenture Trustee and RBSHD 2013-1, Prophet is entitled to assert any legal or equitable right, remedy or claim under the Trust Agreement and is a third-party beneficiary under the Trust Agreement.

119.    Prophet has performed its obligations under the Trust Agreement.

120.    Christiana Trust breached its obligations as Owner Trustee under the Trust Agreement.

121.    The Trust Agreement provides, among other things, that Christiana Trust, as Owner Trustee, shall have the duty to discharge (or cause to be discharged) all of the duties expressly required to be performed by the Owner Trustee under the terms of the Trust Agreement and the other Transaction Documents.

122.    For example, Section 2.30(vi) of the Trust Agreement provides that Christiana Trust is empowered to exercise a variety of powers at the direction of the Majority Certificateholder, so long as the action directed is "limited to actions in furtherance of the transactions contemplated by the Indenture and the Servicing Agreement."

123.    Christiana Trust breached this provision when it accepted directions from the Majority Certificateholder that were not in furtherance of the transactions contemplated by the Indenture and the Servicing Agreement.  Christiana Trust also did not comply with its obligations

under the Indenture and the Servicing Agreement.

124.    As a direct result of Christiana Trust's breaches of the Trust Agreement, Prophet and the other Noteholders have been damaged in an amount of the loss of their shares of income that they would have been entitled to had Christiana Trust not allowed Browndorf and his affiliates to abscond with, upon information and belief, in excess of $40 in collateral value of Mortgage Assets without providing any value to the Trust.

**THIRD CAUSE OF ACTION**
**Breach of Contract:  Breach of the Servicing Agreement**
**(Brought by Prophet both Individually and Derivatively on Behalf of the Indenture Trustee and RBSHD 2013-1)**

125.    Prophet incorporates the allegations contained in paragraphs 1 through 124 as if set forth fully herein.

126.    The Servicing Agreement is a valid and enforceable contract between the Issuer (signed by Christiana Trust as Owner Trustee), Christiana Trust, as Indenture Trustee, the Paying Agent and SLS and Rushmore.

127.    As a Noteholder of RBSHD 2013-1, and derivatively on behalf of the Indenture Trustee and RBSHD 2013-1, Prophet is entitled to assert any legal or equitable right, remedy or claim under the Servicing Agreement and is a third-party beneficiary under the Servicing Agreement.

128.    Prophet has performed its obligations under the Servicing Agreement.

129.    Christiana Trust breached its obligations under the Servicing Agreement.

130.    The Servicing Agreement provides, among other things, that the Servicers shall service and administer the Mortgage Assets in accordance with Accepted Servicing Practices and that the Indenture Trustee and the Issuer shall notify a Servicer when it fails duly to observe or perform in any material respect covenants or agreements on the part of such Servicer.

131. For example, Section 7.04 of the Servicing Agreement provides that any successor to a Servicer appointed by the Majority Certificateholder shall be: (i) a HUD approved servicer and (ii) have a net worth of at least $10,000,000. In addition, any successor Servicer must be acceptable to the Seller (as evidenced by its written consent).

132. Among other things, Christiana Trust, as both Owner Trustee and Indenture Trustee, knew or should have known that DCM was not qualified to be the successor Servicer, that DCM-P1 lied about DCM's qualifications, and that Browndorf had misappropriated Mortgage Assets and that the appointment of DCM as Servicer was for the purpose of further misappropriating Mortgage Assets. It is unclear whether DCM also was acceptable to the Seller, as DCM-P1 alleged that it acceded to the Seller, but to date Prophet has not seen any evidence of such assignment.

133. Christiana Trust breached its obligations in nonetheless appointing DCM as Servicer. It thereafter breached its obligations in failing to notify DCM of its default when it failed and refused to service a single Mortgage Loan, much less pursuant to Accepted Servicing Practices. Christiana Trust knew of DCM's default because the Trust's remittance reports demonstrated DCM was not servicing the Mortgage Loans, as no cash real flows were received despite the historic seller's real estate market.

134. As a direct result of Christiana Trust's breaches of the Servicing Agreement, Prophet and the other Noteholders have been damaged in an amount of the loss of their shares of income that they would have been entitled to had Christiana Trust not allowed Browndorf and his affiliates to abscond with, upon information and belief, damages in excess of $40 million.

## FOURTH CAUSE OF ACTION
### Breach of Fiduciary Duty

135.    Prophet incorporates the allegations contained in paragraphs 1 through 134 as if set forth fully herein.

136.    Under New York law, which governs the obligations of Christiana Trust as Indenture Trustee under the Indenture, after the occurrence of an Event of Default, the Indenture Trustee owed a fiduciary duty and a duty of loyalty to the Trust and all Noteholders, regardless of any limitations or exculpatory provisions contained in the Indenture.  This fiduciary duty includes the obligation to exercise its contractually conferred rights and powers in good faith and to bring all available claims to benefit the Trust and the Noteholders following an Event of Default.

137.    Following the Events of Default described above, Christiana Trust breached its fiduciary duties to the Trust and the Noteholders in several respects, including, but not limited to:

- By failing to declare an Event of Default on August 31, 2021—at the latest— when it authorized the August Fraudulent Sale;

- By allowing DCM to continue "servicing" Mortgage Loans as Servicer despite either knowing or being in possession of information that would have allowed it to know, that DCM was not adequately performing its duties as Servicer;

- By declining to take any steps to understand what assets remain in the Trust; and

- By not investigating whether any Mortgage Assets had been fraudulently conveyed with Christiana Trust's knowledge or consent.

138.    Christiana Trust's breaches of its fiduciary duty have directly and proximately caused damages to the Trust, upon information and belief, in excess of $40 million.

139.    Christiana Trust's breaches of its fiduciary duty have injured all Noteholders,

including Plaintiff, in that they caused Plaintiff's losses and have diminished the value of the Notes and have prevented the Noteholders from protecting the rights of the Trust.

### FIFTH CAUSE OF ACTION
### Negligence and Gross Negligence
### (Brought by Prophet both Individually and Derivatively on Behalf of the Indenture Trustee and RBSHD 2013-1)

140.    Prophet incorporates the allegations contained in paragraphs 1 through 139 as if set forth fully herein.

141.    As a Noteholder of RBSHD 2013-1, and derivatively on behalf of the Indenture Trustee and RBSHD 2013-1, Prophet is entitled to assert any legal or equitable right, remedy or claim under the Indenture and is a third-party beneficiary under the Indenture.

142.    Under New York law, Christiana Trust owed Noteholders, including Prophet, extra-contractual duties to perform ministerial acts with due care and avoid conflicts of interest. As described in detail above, Christiana Trust performed or failed to perform its responsibilities in a grossly inadequate and negligent manner when it failed to act to preserve Trust assets by knowingly permitting DCM to serve as a successor Servicer.

143.    More specifically, Christiana Trust ignored specific evidence that DCM was not qualified to serve as Servicer and, as a result, DCM and Browndorf obtained access to the Mortgage Loans and were able to abscond with them.  The Trust further was damaged in the vein of higher costs and SLS's attorney's fees in opposing DCM's efforts in the BP Fisher Bankruptcy.

144.    Christiana Trust further knowingly assisted Browndorf and his related entities in transferring Mortgage Loans in a non-arm's length transaction to an affiliate in violation of the Transaction Documents when Christiana Trust knew Browndorf had already misappropriated Mortgage Assets and had been specifically warned that he was likely to do so again.  It also failed to properly ensure that the number of Mortgage Loans in the Trust was properly reported following

sales of large groups of Mortgage Loans.

145.    Christiana Trust further failed and refused to appear after having been served with legal process following an Event of Default, resulting in a default judgment against the Trust.

146.    Moreover, Christiana Trust had a duty to avoid conflicts of interest, but nonetheless did nothing when it became clear that it had conflicts of interest by serving as both Owner Trustee and Indenture Trustee.

147.    Christiana Trust's negligence, gross negligence and breach of its duty to avoid conflicts of interests have directly and proximately caused damages to the Trust and Noteholders. Among other things, the Trust's Collateral has been decimated such that it is unlikely that the Noteholders will be paid.

**SIXTH CAUSE OF ACTION**
**Aiding and Abetting Fraud**
**(Brought by Prophet both Individually and Derivatively on Behalf of the Indenture Trustee and RBSHD 2013-1)**

148.    Prophet incorporates the allegations contained in paragraphs 1 through 147 as if set forth fully herein.

149.    As a Noteholder of RBSHD 2013-1, and derivatively on behalf of the Indenture Trustee and RBSHD 2013-1, Prophet is entitled to assert any legal or equitable right, remedy or claim under the Indenture and is a third-party beneficiary under the Indenture.

150.    Christiana Trust aided and abetted Browndorf and his affiliates in their fraudulent scheme to misappropriate Trust assets and conceal such misappropriation from the Noteholders.

151.    Christiana Trust had actual knowledge of the fraud as evidenced by, among other things: (i) SLS's June and September 2020 letters informing Christiana Trust (as both Owner Trustee and Indenture Trustee) that Browndorf, through BP Fisher, had misappropriated Trust assets; (ii) SLS's June and September 2020 letters informing Christiana Trust of SLS's grave

concern about the DCM's lack of qualifications as a Servicer and its concern that Browndorf would use DCM to further conceal and misappropriate Mortgage Assets; (iii) SLS's warning that DCM would try to leverage its position as Servicer to require the withdrawal of SLS's proof of claim on seeking to recover for missing Trust assets; and (iv) DCM's May 7, 2021 request to transfer SLS's proof of claim.

152.    Rather than take actions to block Browndorf's fraud, which it should have done, Christiana Trust acquiesced to and assisted in his fraudulent activities, most likely in an attempt to, among other things: (i) continue receiving fees for its service as Trustee; and (ii) prolong the discovery of its numerous failures as Trustee.

153.    Christiana Trust substantially assisted Browndorf and his affiliates in their fraudulent scheme.  Among other things, Christiana Trust: (i) installed DCM as Servicer; (ii) allowed it to be Servicer for the Trust; (iii) allowed DCM to remain as Servicer despite the fact that Christiana Trust knew that DCM was not servicing the Mortgage Loans (as evidenced by the remittance reports); (iv) conveyed large numbers of Mortgage Loans at Browndorf's and DCM-P1's direction in a non-arm's length transaction that did not afford the Trust any real value; (v) misrepresented to Noteholders that the November Fraudulent Sale would cure an Event of Default, and (vi) misrepresented or knowingly allowed others to misrepresent and continue to misrepresent the number of Mortgage Loans in the Trust.

154.    As a direct and proximate result of Christiana Trust's active and knowing participation in furtherance of Browndorf's and his affiliates' fraudulent scheme, Prophet and the other Noteholders have been damaged in an amount to be proven at trial.  Prophet alone has been damaged no less than $37 million.

## SEVENTH CAUSE OF ACTION
### Aiding and Abetting Breach of Fiduciary Duty
**(Brought by Prophet both Individually and Derivatively on Behalf of the Indenture Trustee and RBSHD 2013-1)**

155.    Prophet incorporates the allegations contained in paragraphs 1 through 154 as if set forth fully herein.

156.    As a Noteholder of RBSHD 2013-1, and derivatively on behalf of the Indenture Trustee and RBSHD 2013-1, Prophet is entitled to assert any legal or equitable right, remedy or claim under the Indenture and is a third-party beneficiary under the Indenture.

157.    As successor Servicer, DCM owed fiduciary duties to the Trust.

158.    Christiana Trust aided and abetted DCM in its breach of its fiduciary duties.

159.    Christiana Trust had actual knowledge of the breach of fiduciary duty as evidenced by, among other things: (i) SLS's June and September 2020 letters informing Christiana Trust (as both Owner Trustee and Indenture Trustee) that Browndorf, through BP Fisher, had misappropriated Trust assets; (ii) SLS's June and September 2020 letters informing Christiana Trust of SLS's grave concern about the DCM's lack of qualifications as a Servicer and its concern that Browndorf would use DCM to further conceal and misappropriate Mortgage Assets; (iii) SLS's warning that DCM would try to leverage its position as Servicer to require the withdrawal of SLS's proof of claim on seeking to recover for missing Trust assets; and (iv) DCM's May 7, 2021 request to transfer SLS's proof of claim.

160.    Christiana Trust substantially aided DCM in its breach of its fiduciary duties by empowering it as successor Servicer despite knowing that it was unqualified and that DCM intended not to act in the best interests of the Trust, but rather in the best interests of Browndorf and BP Fisher in the BP Fisher Bankruptcy.

161.    Christiana Trust substantially assisted Browndorf and DCM in DCM's breach of

fiduciary duty.  Among other things, Christiana Trust: (i) installed DCM as Servicer; (ii) allowed it to be Servicer for the Trust; (iii) allowed DCM to remain as Servicer despite the fact that Christiana Trust knew that DCM was not servicing the Mortgage Loans (as evidenced by the remittance reports); (iv) conveyed large numbers of Mortgage Loans at Browndorf's and DCM-P1's direction in a non-arm's length transaction that did not afford the Trust any real value; (v) misrepresented to Noteholders that the November Fraudulent Sale would cure an Event of Default, and (vi) misrepresented or knowingly allowed others to misrepresent and continue to misrepresent the number of Mortgage Loans in the Trust.

162.    As a direct and proximate result of Christiana Trust's active and knowing participation in furtherance of Browndorf's and his affiliates' breach of fiduciary duty, Prophet has been damaged in an amount to be proven at trial of not less than $40 million.

## EIGHTH CAUSE OF ACTION
### Fraud

163.    Prophet incorporates the allegations contained in paragraphs 1 through 162 as if set forth fully herein.

164.    Christiana Trust made numerous false statements concerning the Trust to Prophet and all other Noteholders.

165.    Specifically, on November 8, 2021, Christiana Trust represented to Prophet and all other Noteholders that "the Event of Default is being cured by a loan sale" despite knowing that— as a result of terms Christiana Trust agreed to—the November Fraudulent Sale would see no funds returning to the Trust.

166.    Additionally, Christiana Trust supplied, or caused to be supplied, remittance reports to Prophet and all other Noteholders falsifying the Trust assets held by the Trust.  On October 25, 2021, the remittance report stated that the Trust held 74 Mortgage Loans.  On October 25, 2022,

the remittance report stated that the Trust held 72 Mortgage Loans.  Upon information and belief, by November 25, 2021, the Trust held record title to only 12 Mortgage Loans.

167.    Christiana Trust knew that these statements were false when made but made them or caused them to be made in any event, upon information and belief, in an effort to conceal from the Noteholders the extent of damage it had allowed Browndorf to do to the Trust.  Alternatively, Christiana Trust had a duty to correct the false statements in the remittance reports regarding the number of Mortgage Loans in the Trust, but failed to do so.

168.    Prophet and the other Noteholders reasonably relied upon the statements made by Christiana Trust in maintaining their investment in the Trust and in forbearing action that could have avoided further damage to the Noteholders and the Trust Estate.

169.    As a direct and proximate result of Christiana Trust's false statements, Prophet has been damaged in an amount to be proven at trial of not less than $37 million.

### NINTH  CAUSE OF ACTION
### Violation of the Trust Indenture Act

170.    Prophet incorporates the allegations contained in paragraphs 1 through 165 as if set forth fully herein.

171.    The Indenture is an indenture and Christiana Trust is an "indenture trustee," under the Trust Indenture Act, 15 U.S.C. § 77aaa.

172.    As a noteholder, Prophet is a trust beneficiary entitled to the protections afforded under the Trust Indenture Act.

173.    The Trust Indenture Act applies to the Indenture.  15 U.S.C. § 77ddd.

174.    Christiana Trust violated the Trust Indenture Act in at least two ways.

175.    *First*, TIA Section 315(b) provides that the indenture trustee must notify Noteholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."

15 U.S.C. § 77ooo(b).  As discussed above, with respect to the Trust, Christiana Trust failed to notify Noteholders of defaults.

176.    *Second*, in the case of defaults (as that term is defined in the indenture), the Trust Indenture Act requires that the trustee exercise its rights and powers under the governing agreement as a "prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs."  15 U.S.C. § 77ooo(c).  As discussed above, Christiana Trust did not act prudently to address the issues leading to the Event of Default or act prudently following the Event of Default.

177.    These breaches and violations of the Trust Indenture Act have directly and proximately caused actual damages to the Trust and Noteholders, including Prophet, in that they have deprived the Trust of valuable remedies and allowed tens of millions of dollars of the Trust's assets to waste away.

178.    Christiana Trust is liable to Prophet and the Noteholders for damages incurred as a result of its violations of the Trust Indenture Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Prophet Mortgage Opportunities, LP prays for judgment in its favor and against Christiana Trust as follows:

A.    Awarding monetary damages against the defendant in an amount sufficient to compensate Prophet for its losses;

B.    On its derivative claims for relief, monetary damages against Christiana Trust as Owner Trustee in favor of the Indenture Trustee and/or the RBSHD 2013-1 Trust for the amount of damages sustained by the Trust;

C.    On its tort claims, awarding punitive damages;

D.      Awarding Prophet its reasonable costs and expenses incurred in this action,

including reasonable attorney's fees, expert's fees and expenses; and

E.      Such other relief, at law or in equity, as the Court may deem just and proper.

Dated: New York, New York                    SCHULTE ROTH & ZABEL LLP
       November 16, 2022

                                             */s/ Gayle R. Klein*
                                             _____

                                             Gayle R. Klein
                                             Elizabeth V. Curran
                                             Steven R. Fisher
                                             SCHULTE ROTH & ZABEL LLP
                                             919 Third Avenue
                                             New York, New York  10022
                                             Tel.:  (212) 756-2044
                                             Fax:  (212) 593-5955
                                             gayle.klein@srz.com
                                             elizabeth.curran@srz.com
                                             steven.fisher@srz.com

                                             *Attorneys for Plaintiff Prophet Mortgage
                                             Opportunities, LP*

**VERIFICATION**

STATE OF TEXAS          )
                        ) SS:
COUNTY OF TRAVIS        )

      Kurt Rechner, having been duly sworn, deposes and says pursuant to Federal Rule of Civil Procedure 23.1 as follows:

      I am the Vice President of Prophet Asset Management, LLC, the general partner of Prophet Mortgage Opportunities, LP, the Plaintiff in this action.  I have read the foregoing Complaint and know the contents thereof.  The contents are true to my own knowledge except as to the matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

                              _____
                               Kurt Rechner

Sworn to before me this
16th day of November, 2022

_Rebecca D. Ballard_
Notary Public

My commission expires:  12/7/2025

REBECCA D. BALLARD
Notary Public, State of Texas
Comm. Expires 12-07-2025
Notary ID 125517243

44