UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                                 :

PROPHET MORTGAGE OPPORTUNITIES, LP,   :

                          Plaintiff,           :

                                                 :

          -v-                                :             22 Civ. 9771 (JPC)

                                                 :           <u>OPINION AND ORDER</u>

CHRISTIANA TRUST, a Division of Wilmington  :
Savings Fund Society, FSB, as Both Owner Trustee and  :
Indenture Trustee of RBSHD 2013-1 Trust,    :

                                     :

                      Defendant,        :

                                             :

and RBSHD 2013-1 TRUST.                     :

                    Nominal Defendant.   :

                                           :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

       Although unrelated to the 2008 financial crisis, this case in many ways parallels the trend

in this District of lawsuits against trustees of residential-mortgage-backed securities trusts.  *See*

*BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F.

Supp. 3d 377, 382 (S.D.N.Y. 2017).   Here, Plaintiff Prophet Mortgage Opportunities, LP

("Prophet") alleges that Defendant Christiana Trust ("Christiana Trust" or "CT") as both the

Owner Trustee and the Indenture Trustee of the RBSHD 2013-1 Trust (the "Trust") broadly

speaking "knowingly assist[ed] Matthew Browndorf and his affiliates in misappropriating more

than $40 million in mortgage loans."  Dkt. 1 ("Compl.") ¶ 1.  Prophet brings this action against

Christiana Trust and the Trust (collectively, "Defendants"), asserting direct claims as well as

derivative claims on behalf of the Indenture Trustee.

Currently pending before the Court is Defendants' motion for partial dismissal. For the reasons that follow, the Court grants Defendants' motion in part and denies it in part. The Court dismisses Prophet's derivative claims. As to the direct claims, the Court grants Defendants' motion as to the First Cause of Action as against the Owner Trustee and as to the Seventh Cause of Action, and accordingly dismisses those claims. The Court denies Defendants' motion as to the direct version of the Second, Third, Fourth, Fifth, Sixth, and Eighth Causes of Action, although for many of them the Court allows the causes of action to proceed only in reduced form.

## I. Background

### A.      Facts[1]

Christiana Trust is a federally chartered savings association that, most relevantly for the purposes of this case, serves as the trustee of Nominal Defendant RBSHD 2013-1 Trust, which is referred to herein as the Trust. *Id.* ¶¶ 1, 10. The Trust is a Delaware statutory trust. *Id.* ¶ 10. As described in further detail below, Prophet is a Noteholder of the Trust.

"Explanations of the typical formation process and structure of RMBS trusts abound in this District, and this Court will not here reinvent the wheel. Only a brief description is provided for context." *BlackRock Allocation Target Shares: Series S. Portfolio*, 247 F. Supp. 3d at 383. Here, RBS Financial Products Inc. (the "Seller") acquired a pool of foreclosed properties and mortgage loans (collectively, the "Mortgage Assets"). Compl. ¶ 13. These assets were securitized in a two-step process: first, RBS Financial Products "conveyed the assets to RBS Acceptance, Inc." (the "Depositor"), then RBS Acceptance "transferred the Mortgage Assets to the Trust." *Id.* ¶¶ 13-14. "The Trust then issued both Notes and Certificates, pursuant to which the holders of each have a

---

[1] Except where expressly noted otherwise, the following facts, which are assumed true for purposes of this Opinion and Order, are taken from the Complaint and the documents incorporated therein by reference. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

right to certain cash flows stemming from the Mortgage Assets in a certain priority."  *Id.* ¶ 14

(internal quotation marks omitted).  "Because the Trust is the entity that issued the Notes, the Trust

is also known as the 'Issuer.'"  *Id.*  Prophet provided the following diagram in its Complaint to

describe the Trust structure writ large:



*Id.* ¶ 26.

### 1.      Trust Structure and Transaction Documents

The Notes and Certificates were issued pursuant to—and also governed by—a set of three

interlocking agreements: the Trust Agreement, the Indenture, and the Securitization Servicing

Agreement (the "Servicing Agreement") (collectively, the "Transaction Documents").[2]  All three

---

[2] These three documents are incorporated by reference to the Complaint, given their centrality both to the Complaint and, consequently, the Court's analysis of Defendants' motion to dismiss.  *See Off. Sol. Grp., LLC v. Nat'l Fire Ins. Co. of Hartford*, 544 F. Supp. 3d 405, 412 (S.D.N.Y. 2021) ("A document is incorporated by reference if '[the party's] action or defense' is based upon it, and 'the complaint . . . make[s] a clear, definite and substantial reference' to it." (quoting *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020)) (alterations in original)).

of these documents were entered into on September 30, 2013.  *Id.* ¶¶ 15, 21, 27.  The Court will discuss each in turn, focusing on the provisions most relevant to Defendants' motion to dismiss.

The Depositor, Christiana Trust, and Wells Fargo, N.A. (the "Paying Agent") entered into the Trust Agreement.  *Id.* ¶ 15; *see* Dkt. 41 ("Lorenzo Decl."), Exh. B ("Trust Agreement").  With certain exceptions, the Trust Agreement is governed by Delaware law, Trust Agreement § 11.11, and, among other provisions, governs the issuance of Certificates and appoints Christiana Trust as the Owner Trustee, Compl. ¶¶ 15-17.  "[The position] is called the Owner Trustee because, pursuant to the Trust Agreement, the Trust itself owns the Mortgage Assets."  *Id.* ¶ 16.  The Trust Agreement "creates . . . a single class of Certificates that affords the Certificateholders certain rights of payment from the Mortgage Assets," although, as explained below, the Noteholders are prioritized over the Certificateholders in terms of rights of payment.  *Id.* ¶¶ 15, 23.  Relatedly, the Trust Agreement also grants the Majority Certificateholder—"the holder of Certificates evidencing not less than a majority of the average undivided beneficial interests in all Trust property and assets, and any proceeds thereof"—rights to direct the Trust to take certain actions.  *Id.* ¶ 18.  Much of the controversy in this case concerns the scope of the Majority Certificateholder's rights to direct the Trust—an unsurprising development, given that the Complaint alleges that DCM-P1, LLC, a Browndorf-controlled entity, was the Majority Certificateholder "at all times germane to this action."  *Id.* ¶ 20; *see infra* III.B.2.  This direction generally took the form of "the Majority Certificateholder . . . by written instruction direct[ing] the Owner Trustee in the management of the Trust."  Trust Agreement § 6.03(a); *see* Compl. ¶ 19.

The Trust acting through Christiana Trust as the Owner Trustee, the Paying Agent, and Christiana Trust as the Indenture Trustee entered into the Indenture.  Compl. ¶ 21; *see* Lorenzo Decl., Exh. C ("Indenture").  Through the Indenture's Granting Clause, the Trust as the Issuer

"pledged all of its right, title and interest in essentially everything relating to the Mortgage Assets for the benefit of the Noteholders."  Compl. ¶ 22.  The Indenture also sets forth a variety of payment procedures, including the prioritization of Noteholders over Certificateholders.  *Id.* ¶¶ 23-24; *see generally* Indenture § 3.03.  Perhaps most importantly, the Indenture also defines the scope of Christiana Trust's duties as the Indenture Trustee.  *See* Compl. ¶ 26.

Finally, the Servicing Agreement—as the name suggests—concerns the servicing of the Mortgage Assets "to generate cash flows so that Noteholders . . . and Certificateholders . . . are paid in full."  *Id.* ¶ 27; *see* Lorenzo Decl., Exh. D ("Servicing Agreement").  The Servicing Agreement was entered into by the Trust through the Owner Trustee, the Indenture Trustee, the Paying Agent, and several other parties.  Compl. ¶ 27.  The Agreement provides that Specialized Loan Servicing LLC ("SLS") and another Servicer "are to service and administer the Mortgage Assets in accordance with 'Accepted Servicing Practices,' the related Mortgage Loan Documents, the Legal Requirements and the Servicing Agreement."  *Id.* ¶ 28.  Perhaps most importantly—and as discussed extensively below—the Agreement also sets forth procedures for replacing a Servicer.  *Id.* ¶ 29.  Generally speaking, if the Trust as the Issuer terminates a Servicer without cause, the Majority Certificateholder has a right to appoint a successor that is "a [U.S. Department of Housing and Urban Development] approved servicer and . . . ha[s] a net worth of at least $10,000,000."  Servicing Agreement § 7.04.

### 2.    Browndorf's Alleged Misappropriation of Funds and Christiana Trust's Alleged Involvement

Browndorf was an attorney and the Chief Executive Officer of Plutos Sama, LLC.  Compl. ¶ 31.  Plutos Sama owned BP Fisher Law Group, LLP, "a law firm that represented lenders and mortgage loan servicers in foreclosure and default actions."  *Id.* ¶ 32.  In March 2017, "SLS retained BP Fisher to provide foreclosure and default related legal services in connection with the

processing of foreclosure, bankruptcy and/or eviction actions related to the Mortgage Loans." *Id.* ¶ 33. While BP Fisher was supposed to distribute the funds it collected through these proceedings to SLS, the law firm failed to do so for foreclosures related to six mortgage loans over the course of 2017 and 2018, depriving SLS (and, in turn, the Trust) of approximately $1,700,000. *Id.* ¶ 34. The Complaint alleges that Browndorf instead "misappropriated those funds for, among other things, his own personal use," and it further points to the fact that Browndorf was indicted in August 2022 in the District of Maryland on wire fraud and money laundering charges related to his diversion of BP Fisher client funds. *Id.* ¶ 35.[3] Separately, the Complaint also alleges that "Browndorf caused BP Fisher to file" a Chapter 11 petition in the U.S. Bankruptcy Court for the Central District of California. *Id.* ¶ 36. SLS filed a proof of claim for the $1,700,000 in the bankruptcy proceeding. *Id.* ¶ 37.

Christiana Trust's alleged entanglement with Browndorf and the entities he controlled comes in several forms. The first concerns the replacement of SLS as a Servicer in 2020. As noted above, DCM-P1 was the Majority Certificateholder at the time; the Complaint alleges that "Browndorf caused DCM-P1 to direct Christiana Trust" to replace SLS and another Servicer with "DCM-P1's own managing member, Distressed Capital Management, LLC ('DCM') [another Browndorf-controlled entity], as sole Servicer for the Trust." *Id.* ¶ 39. This was despite SLS warning Christiana Trust in two letters—one in June 2020 and another in September 2020—that

---

[3] Browndorf continues to face charges in the District of Maryland for four counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2 and four counts of money laundering in violation of 18 U.S.C. § 1957. *See United States v. Browndorf*, No. 22 Cr. 291 (LKG) (D. Md.), Dkt. 1. In addition, on November 30, 2023, he was sentenced in the Eastern District of Wisconsin principally to a term of forty-eight months in prison, followed by three years of supervised release, and was ordered to pay restitution in the amount of $831,260.06, after his guilty plea for willful failure to collect and pay over federal taxes, in violation of 26 U.S.C. § 7202. *See United States v. Browndorf*, No. 22 Cr. 252 (JPS) (E.D. Wisc.), Dkt. 32.

DCM, among other concerns, was not a qualified Servicer under the terms of the Servicing Agreement and that Browndorf was pushing for the replacement "in furtherance of [his] efforts to conceal and misappropriate Mortgage Assets to the detriment of SLS, the Issuer and the Noteholders." *Id.* ¶¶ 42-47.   SLS specifically raised a concern that Browndorf, through DCM, would "thwart" SLS's proof of claim in the BP Fisher bankruptcy proceeding. *Id.* ¶¶ 47, 49.   The replacement nevertheless went through.   *See id.* ¶ 54.

Many of SLS's concerns about DCM came to fruition.   Prophet learned during a July 2022 phone conference with Browndorf that "DCM never serviced a single loan in the time it served as Servicer." *Id.* ¶ 56.   With respect to the BP Fisher bankruptcy, "[a]s SLS predicted, DCM sought to have SLS's claim for the Trust transferred to itself," although it appears as if Prophet was able to stop the diversion of bankruptcy-related funds. *Id.* ¶ 55, n.3.   And Christiana Trust—"acting at the specific direction of DCM-P1"—sold mortgage loans worth over $10,000,000 to a Browndorf-affiliated entity in two sales: one of fourteen loans in August 2021 for $3,000,000, and another of forty-eight loans in November 2021 for $6,632,721.05.   *Id.* ¶ 60.   Significantly, the Complaint alleges that "the Trust received *no cash*" for these sales; rather, "the terms of the Fraudulent Sales included a one-year balloon promissory note from the Browndorf-related entity that, upon information and belief, provided Browndorf (through his affiliate) with an option to then issue yet another promissory note." *Id.* ¶ 61.   The Complaint alleges that the terms of these sales violated the Transaction Documents by, among other issues, not being arm's length transactions. *Id.* ¶¶ 61-63; *see generally id.* ¶¶ 64-65.   The Complaint further alleges that the Browndorf-affiliated entity that bought these loans is in default on at least the August 2021 purchase agreement, yet Christiana Trust "failed to identify . . . whether there is recourse available for the Trust." *Id.* ¶¶ 66-67.

In any case, shortly before the November 2021 loan sale, the Issuer, *i.e.*, the Trust, defaulted on its obligations to the Noteholders under the Indenture by failing to make an interest payment (referred to as the "Event of Default"). *Id.* ¶¶ 69-70. Christiana Trust as the Indenture Trustee notified the Noteholders of this default. *Id.* ¶ 69. "The notice provided to the Noteholders contained a copy of [a certificate that] . . . stated specifically that the Issuer failed to pay full interest and that the 'status of the occurrence of the Event of Default is being cured by a loan sale,'" which appears to be a reference to the subsequent November 2021 loan sale. *Id.* ¶¶ 70-71. The Complaint alleges that Christiana Trust knew that this statement was inaccurate because the terms of the November 2021 loan sale dictated that "[t]he amount to be deposited into the Payment Account on the Closing Date is $0, gross of reimbursable deal expenses of $0," a clause which Prophet asserts meant "that not a single dollar of the $6,632,721.05 purchase price would be paid to the Payment Account and, therefore, to the Noteholders." *Id.* ¶¶ 71-72. Similar to the August loan sale, the Complaint alleges that no payments have been made on the loans sold in the November 2021 sale, yet Christiana Trust has done little to remedy this failure. *Id.* ¶¶ 74-75. The Complaint also alleges two further failures on Christiana Trust's part: first, that Christiana Trust failed to correct monthly remittance reports that represented to the Noteholders that the Trust holds seventy-two mortgage loans, a figure that failed to account for the loan sales—all despite Christiana Trust's knowledge of these sales—and that the Trust should have declared an Event of Default in August 2021. *Id.* ¶¶ 76-77, 81. Finally, the Complaint generally faults Christiana Trust for simultaneously serving as the Owner and the Indenture Trustee, a structure which the Complaint characterizes as producing an "irreconcilabl[e]" conflict of interest. *Id.* ¶ 92.

**B.     Procedural History**

Prophet filed this action on November 16, 2022, bringing claims on behalf of itself as well as derivatively on behalf of the Indenture Trustee.  Dkt. 1.  The Complaint pleads nine causes of action: (1) breach of contract with respect to the Indenture, Compl. ¶¶ 103-115; (2) breach of contract with respect to the Trust Agreement, *id.* ¶¶ 116-124; (3) breach of contract with respect to the Servicing Agreement, *id.* ¶¶ 125-134; (4) breach of fiduciary duty, *id.* ¶¶ 135-139; (5) negligence and gross negligence, *id.* ¶¶ 140-147; (6) aiding and abetting fraud, *id.* ¶¶ 148-154; (7) aiding and abetting breach of fiduciary duty, *id.* ¶¶ 155-162; (8) fraud, *id.* ¶¶ 163-169; and (9) violation of the Trust Indenture Act, *id.* ¶¶ 170-178.  All but the Fourth, Eighth, and Ninth Causes of Action are brought by Prophet both individually and derivatively on behalf of the Indenture Trustee.  *Id.* at 30, 32, 33, 36, 37, 39.

Defendants filed this motion to dismiss on July 5, 2023.  Dkt. 39 ("Motion").  Prophet filed its opposition on September 20, 2023, Dkt. 56 ("Opposition"), and Defendants replied on October 20, 2023, Dkt. 60 ("Reply").  Defendants seek dismissal on all causes of action except for the First Cause of Action, insofar as that it is brought directly against the Indenture Trustee, and the Ninth Cause of Action.  *See generally* Lorenzo Decl., Exh. A.  The Court heard argument on the Motion on January 17, 2024, *see* Dkt. 86 ("Tr."), and ordered supplemental briefing on several issues thereafter, Dkt. 90.  The parties accordingly filed their supplemental briefs on January 31, 2024.  Dkts. 97 ("Defendants' Supplemental Brief"), 98 ("Prophet's Supplemental Brief").  Prophet filed a further response on February 1, 2024.  Dkt. 100.  On January 5, 2024, Christiana Trust and the Trust filed a third-party complaint against Browndorf, among others.  Dkt. 72.

## II. Legal Standard

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* These "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although the Court must "accept[] as true the factual allegations in the complaint and draw[] all inferences in the plaintiff's favor," *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015), it need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

"At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156 (2d Cir. 2016). In addition, and as further detailed below, the Sixth Cause of Action for aiding and abetting fraud and the Eighth Cause of Action for fraud are subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b). *See Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014). Rule 9(b) mandates that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

## III.  Discussion

### A.  Derivative Claims

Prophet brings the First, Second, Third, Fifth, Sixth, and Seventh Causes of Action both directly and derivatively on behalf of the Indenture Trustee.[4]  *See* Compl. at 30, 32, 33, 36, 37, 39. Federal Rule of Civil Procedure 23.1 generally bars a plaintiff from bringing a derivative action "if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." Fed. R. Civ. P. 23.1(a).  "Although the Second Circuit has not held that there is a *per se* rule against bringing derivative and direct claims simultaneously, . . . courts in this District have applied a strict standard in scrutinizing direct and derivative actions for signs of conflict . . . ."  *Hodnett v. Medalist Partners Opp. Master Fund II-A, L.P.*, No. 21 Civ. 38 (MKV), 2022 WL 4072935, at *6 (S.D.N.Y. Sept. 2, 2022) (alterations in original) (internal quotation marks omitted).  "An actual conflict may exist where substantial recovery on the [direct] claim may reduce the potential recovery on behalf of the corporation on the derivative claim." *Tatintsian v. Vorotyntsev*, No. 16 Civ. 7203 (GHW), 2018 WL 2324998, at *3 (S.D.N.Y. May 22, 2018) (internal quotation marks omitted).

In its supplemental briefing, Prophet asserts that the above-cited "strict standard" does not apply to its derivative claims because, unlike in *Tatintsian* and other cases that have applied this standard, Prophet does not "s[eek] to recover on the same claims on behalf of a company and directly from the company."  Prophet's Supplemental Brief at 2.  Prophet contends that "[t]he

---

[4] Defendants point out that the Complaint also appears to include derivative claims on behalf of the Trust for the same causes of action, Reply 3-4, but Prophet averred in its Opposition that it brings no such claims, Opposition at 14-15.  The Court therefore deems any derivative claims brought on behalf of the Trust abandoned, to the extent that Prophet brought them in the first place.

crucial distinction" between these cases and its own "is that the Indenture Trustee is only a pass-through vehicle—it is not the actual beneficiary of any claims (unlike the company-beneficiaries in the *Tatintsian* line of cases)."  *Id.* at 3.  The Court is unpersuaded.  While Prophet is correct that most of the relevant cases have concerned derivative claims brought on behalf of corporations, fundamentally, Rule 23.1 serves to protect "the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association," at least just as much as the corporation itself.  Fed. R. Civ. P. 23.1(a).  Indeed, the court in *Tatintsian* made clear that the conflict was the potential "reduc[tion] [to] the recovery for the company *and its shareholders* on the derivative claims."  2018 WL 2324998, at *3 (emphasis added); *see also Grugrev v. Licul*, 229 F. Supp. 3d 267, 296 (S.D.N.Y. 2017) ("[T]he existence of an actual conflict disqualifies a plaintiff from acting *as representative* [of shareholders or equivalents] . . . ." (emphasis added) (internal quotation marks omitted)); *Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 135 (S.D.N.Y. 1991) ("[The plaintiff's] derivative action cannot proceed if a conflict of interest disables him from fairly and adequately representing *the other shareholders* of [the corporation]." (emphasis added)).  Applying that logic, the conflict at issue is not one between Prophet and the Trust, but rather one between Prophet and the other Noteholders.  The question at this juncture thus is the extent to which Prophet can fairly represent those other Noteholders while simultaneously bringing direct claims against Christiana Trust.

Here, Prophet's recovery on its direct claims may well reduce the Indenture Trustee's recovery on its derivative claims.  Indeed, much like in *Tatintsian*, where the court found that pursuing direct and derivative claims simultaneously presented an impermissible conflict of interest that could have prevented the plaintiff from fairly and adequately representing the nominal defendant and its other shareholders, 2018 WL 2324998, at *3-4, Prophet's recovery may come

from the Trust itself.  Section 8.02 of the Trust Agreement provides that the Trust will indemnify Christiana Trust for, *inter alia*, liabilities "asserted against Christiana Trust . . . in any way relating to or arising out of the Trust Agreement, any Transaction Document, the Trust Estate, the administration of the Trust or the Trust Estate or the action or inaction of the Owner Trustee hereunder."  Trust Agreement § 8.02.  A scenario in which the Trust must indemnify Christiana Trust for an action brought by the Indenture Trustee constitutes an actual conflict that militates against allowing Prophet to press derivative claims.[5]

To be sure, the Indemnification Clause may not—and perhaps likely will not—apply to at least some of Prophet's derivative claims.  That provision relieves the Trust of its indemnification obligation in case the relevant liability is caused by the Owner Trustee's "own willful misconduct, bad faith or gross negligence," among other reasons.  *Id.* § 7.01; *see id.* § 8.02 (exempting "[e]xpenses arising or resulting from any of the matters described in the second sentence of Section 7.01" from the indemnification requirement).  The Fifth Cause of Action explicitly accuses Christiana Trust of gross negligence, Compl. ¶¶ 140-147, and the Complaint's allegations more generally focus on Christiana Trust's "willful[] . . . participat[ion] in Browndorf's scheme to defraud" the Trust, *id.* ¶ 1.  But the potential lack of indemnification does not resolve the conflicts concerns.  Even if the Trust ultimately is exempt from indemnification, any liability would then fall on Christiana Trust, irrespective of whether the claim was brought directly or derivatively.  In other words, "recovery for the direct and derivative claims could ultimately come from the same

_____

[5] Prophet appears to assert in its supplemental briefing that this provision will not apply to its derivative claims because they are not brought on behalf of the Trust.  *See* Prophet's Supplemental Brief at 4.  The broad language of the provision appears to belie that assertion. Whether brought on behalf of the Trust or the Indenture Trustee, Prophet's claims indisputably "relat[e] to [and] aris[e] out of . . . [the] Transaction Document[s] . . . [and] the administration of the Trust or the Trust Estate."  Trust Agreement § 8.02.  In other words, the provision appears to apply regardless of the party that brings an action against Christiana Trust.

pool of money"; every dollar for the direct claims is potentially one less for the derivative claims. *Tatintsian*, 2018 WL 2324998, at *3.[6]  Nor does this case feature the circumstances where courts in this District have previously allowed direct and derivative claims to proceed in parallel.  There is no allegation that the "plaintiffs and defendants are the only owners of a closely-held entity." *Hodnett*, 2022 WL 4072935, at *6 (collecting cases).  Indeed, as Defendants point out, Reply at 2, the Complaint explicitly notes that Prophet only "holds 82% of Class A Notes" in the Trust, not 100 percent, Compl. ¶ 95.  Nor does the Complaint allege that the Trust has been dissolved or otherwise liquidated.  *See Cordts-Auth v. Crunk, LLC*, 815 F. Supp. 2d 778, 794 (S.D.N.Y. 2011) ("[A]ny potential conflict of interest in th[e] context [of parallel direct and derivative claims], where the types of relief sought may be incompatible, is substantially diminished where the business entity on whose behalf the derivative plaintiff sues has been dissolved or is otherwise no longer in existence."), *aff'd*, 479 F. App'x 375 (2d Cir. 2012).

Prophet's arguments to the contrary are unavailing.  It points to the Complaint's allegation that "the Trust estate has been decimated," Compl. ¶ 5, in arguing that the Trust will not be able to indemnify Christiana Trust should Section 8.02 apply.  *See* Prophet's Supplemental Brief at 4. However, as explained above, the conflicts arise regardless of Section 8.02's application. Prophet's argument that the other Noteholders waived any conflicts because the Indenture grants Prophet as supermajority Noteholder "the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes," Indenture § 5.10, fares no better.  *See* Prophet's Supplemental Brief at 4.  Rule 23.1 furnishes an independent obligation to ensure that Prophet can "fairly and adequately" represent the other

---

[6] While Prophet suggests that "there is no indication that Christiana Trust would be unable to satisfy any judgment in this case," Prophet's Supplemental Brief at 3, even "the potential for . . . a conflict" suffices to warrant scrutiny, *Tatintsian*, 2018 WL 2324998, at *3.

Noteholders, irrespective of the Transaction Documents' provisions.  Finally, the fact that any recovery on the derivative claims "will flow automatically to the Noteholders through the Waterfall provision of the Indenture," Prophet's Supplemental Brief at 3 (emphasis removed), is of no moment, given the aforementioned concerns with the source of recovery on both the direct and derivative claims.

Given the concern over the overlapping sources of recovery discussed above, the Court dismisses the First, Second, Third, Fifth, Sixth, and Seventh Causes of Action to the extent that Prophet brings them derivatively on behalf of the Indenture Trustee.[7]

## B.    Direct Claims

The remainder of the challenged claims are direct claims.  The Court will discuss each in turn.

### 1.  First Cause of Action: Breach of the Indenture

In the First Cause of Action, the Complaint alleges that Christiana Trust breached the Indenture in two ways.  First, the Complaint alleges that Christiana Trust ran afoul of its obligations as the Indenture Trustee under the Indenture by, *inter alia*, not declaring an Event of Default after the August 2021 sale of fourteen loans to a Browndorf-affiliated entity, despite knowing that this sale did not comply with Section 3.06(iv)'s directive that the Trust should not "impair . . . its interest in the Mortgage Loans . . . if any such action would materially and adversely affect the interests of the Noteholders."  Indenture § 3.06(iv); Compl. ¶¶ 109-111.  This aspect of the First Cause of Action is not at issue, since Defendants only move to dismiss the cause of action inasmuch as Prophet brings a claim against Christiana Trust as the Owner Trustee.  *See Lorenzo*

---

[7] In light of this conclusion, the Court need not address the parties' dispute over Prophet's right to bring derivative claims on behalf of the Indenture Trustee.  *See* Motion at 11-13; Opposition at 12-17.

Decl., Exh. A.  Second, Prophet also asserts that Christiana Trust ran afoul of its obligations under the Indenture by "effectuat[ing] and execut[ing] the Fraudulent Sales when it knew that such transactions were not with an unaffiliated party or arm's length," despite Section 8.06 of the Indenture requiring that any sale of the mortgage loans by the Trust as the Issuer be "to unaffiliated third parties in arm's length transactions."  Compl. ¶¶ 112-113; Indenture § 8.06.

Defendants assert that the First Cause of Action should be dismissed against Christiana Trust as the Owner Trustee because the Owner Trustee is not party to the Indenture, Motion at 15-16, and "[i]n general . . . a breach of contract action may only be maintained against a party to the contract," *Jennings v. Hunt Cos., Inc.*, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019) (internal quotation marks omitted).  Defendants specifically point to the Indenture's no-recourse provision, Section 10.18, which provides that "nothing herein contained shall be construed as creating any liability on the part of Christiana Trust . . . to perform any covenant or obligation of the Issuer, either expressed or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto the part of Christiana Trust."  Indenture § 10.18; *see* Motion at 16.  Prophet counters that Christiana Trust as the Owner Trustee took on the Trust's arms-length transaction obligation when it exercised its powers to convey mortgage loans on the Trust's behalf.  *See* Opposition at 17; Trust Agreement § 2.03(iii) ("[T]he Owner Trustee . . . shall have power and authority, and is hereby authorized and empowered, in the name and on behalf of the Trust . . . to assign, grant, transfer, pledge, mortgage and/or convey Mortgage Loans . . . ."); *see generally Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC*, No. 17 Civ. 8987 (GHW), 2019 WL 1244294, at *12 (S.D.N.Y. Mar. 18, 2019) (noting that, under New York law, "even if a party does not sign a written agreement, it will be

bound if the totality of its expressed words and deeds manifests an intent to be bound"); Indenture § 10.10 (dictating that the Indenture is governed by New York law).

Defendants have the better of the argument.  To be sure, "an entity can manifest an intent to be bound by a contract that it did not sign if it directly participated in the negotiation of the contract or if the entity is the parent of a subsidiary that signed the contract and controls the subsidiary for its own purposes," a proposition that logically should apply *a fortiori* to a scenario in which Christiana Trust was separately bound by the contract in its capacity as the Indenture Trustee.  *Flatiron Acquisition Vehicle*, 2019 WL 1244294, at *13 (citing *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (1st Dep't 1997)); *see also Roldan v. Second Dev. Servs., Inc.*, No. 16 Civ. 2364 (DLI), 2018 WL 1701938, at *8 (E.D.N.Y. Mar. 30, 2018) ("[C]ourts have found that a non-signatory assumed the obligations of an agreement where the non-signatory: (1) participated in the negotiation of the contract; (2) micromanaged performance under the contract; (3) acknowledged it was the real party in interest; and (4) made payments on behalf of the signatory.").  The challenge for Prophet, however, is the no-recourse provision.  As noted above, that provision explicitly states that "nothing . . . contained [in the Indenture] shall be construed as creating any liability on the part of Christiana Trust . . . to perform any covenant or obligation of the Issuer, either expressed or implied, contained herein."  Indenture § 10.18; *cf. In re Trs. Established Under the Pooling & Servicing Agreements*, 375 F. Supp. 3d 441, 447 (S.D.N.Y. 2019) ("If the contract is unambiguous, its meaning is a question of law that the Court may decide on a motion to dismiss.").[8]  Prophet does not appear to dispute—nor could it—that the

---

[8] As discussed at *infra* III.B.3, the Trust Agreement does provide for a limited scope of liability for the Owner Trustee "for its own willful misconduct, bad faith or gross negligence."  *See* Trust Agreement § 7.01.  However, "New York law . . . favors applying specific contract terms over more general ones when they conflict."  *Alessi Equip., Inc. v. Am. Piledriving Equip., Inc.*,

arms-length transaction requirement was owed by the Trust (*i.e.*, the Issuer), and not by the Owner Trustee. *See* Indenture § 8.06 ("[T]he *Issuer* shall have the right . . . to sell one or more Mortgage Loans to unaffiliated third parties in arm's length transactions . . . ." (emphasis added)). The same is true of Section 3.06(iv), which the Complaint concedes "obligates *the Trust*." Compl. ¶ 109 (emphasis added); *see* Indenture § 3.06(iv) (providing that, so long as any Notes are outstanding, the Issuer shall not, unless expressly provided by a Transaction Document, "waive or impair . . . its interest in the Mortgage Loans . . . if any such action would materially and adversely affect the interests of the Noteholders").

Therefore, by the plain language of the no-recourse provision, the Owner Trustee cannot be held liable for the Trust's failure to comply with these obligations under the Indenture.[9] Nor can the Court discern any reason to find the no-recourse provision unenforceable as applied to Prophet's breach of contract claim under New York law. On the contrary, while "courts have deemed void similar no-recourse clauses as against public policy [under New York law] when applied against equitable or tort claims[,] . . . courts have enforced no-recourse clauses as applied to contract claims." *Wilmington Tr. Co. v. Hellas Telecomms., S.à.r.l.*, No. 12 Civ. 8686 (JPO),

---

578 F. Supp. 3d 467, 505 (S.D.N.Y. 2022) (internal quotation marks omitted); *see also DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) (holding that, under Delaware law, "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one"). The Trust Agreement's more general clause about the scope of the Owner Trustee's liability under the Transaction Documents writ large cannot trump the Indenture's more specific clause regarding duties under that contract.

[9] While Prophet argued at oral argument that the reference in Section 10.18 to "covenant or obligation" is unclear, Tr. at 41:1-6, the Court disagrees as discussed above.

2016 WL 7339112, at *13 (S.D.N.Y. Aug. 4, 2016).  The Court therefore dismisses the First Cause of Action inasmuch as it is predicated on Christiana Trust's liability as the Owner Trustee.[10]

### 2.    Second Cause of Action: Breach of the Trust Agreement

Defendants urge the Court to dismiss the Second Cause of Action for breach of the Trust Agreement on a different basis.  Rather than attack its merits, Defendants claim that Prophet lacks standing to bring the Second Cause of Action because—contrary to Prophet's assertions—Prophet is not a third-party beneficiary of the Trust Agreement.  *See* Motion at 14-15; Compl. ¶ 118 (asserting that Prophet, as a Noteholder of the Trust, is a third-party beneficiary of the Trust Agreement).

"As a general rule, only parties to a contract and intended third-party beneficiaries may enforce an agreement's provisions."  *Crispo v. Musk*, 304 A.3d 567, 572 n.24 (Del. Ch. 2023) (internal quotation marks omitted); *see also* Trust Agreement § 11.11 (dictating that Delaware law generally governs the Trust Agreement).  "To allege standing as a third-party beneficiary [under Delaware law], a plaintiff must plead that: (i) the contracting parties . . . intended that the third party beneficiary benefit from the contract, (ii) the benefit was intended as a gift or in satisfaction of a pre-existing obligation to that person, and (iii) the intent to benefit the third party was a material part of the parties' purpose in entering into the contract."  *Crispo*, 304 A.3d at 574 (internal quotation marks and alterations omitted).  "Delaware courts have construed no-third-party-beneficiaries provisions that are customized by a carve-out as indicating a strong intent to disclaim third-party beneficiaries."  *Id.* at 575.  "When a provision is customized, [the Delaware

---

[10] The First Cause of Action also appears to encompass Christiana Trust's "fail[ure] . . . to enforce the terms of the August Fraudulent Sale," Compl. ¶ 114, but it is unclear how that would constitute a breach of the Indenture.

Court of Chancery] has concluded that the parties knew how to confer third-party beneficiary status and deliberately chose not to do so with respect to any unlisted groups." *Id.*[11]

The central question with regard to the Second Cause of Action is the interplay between Section 11.03, the Trust Agreement's no-third-party beneficiary provision, and Section 2.03(vi), the provision that Prophet alleges Defendants breached. *See* Compl. ¶¶ 122-123. Section 11.03 is a customized provision much like that at issue in *Crispo*; it provides, in relevant part: "The provisions of the Trust Agreement are solely for the benefit of the Owner Trustee, Christiana Trust, the Trust Paying Agent, the Certificate Registrar, the Depositor, the Certificateholders, the Indemnified Parties, and, *to the extent expressly provided herein*, the Indenture Trustee and *the holders of the Notes*" like Prophet. Trust Agreement § 11.03 (emphasis added). But unlike the provision in *Crispo*, 304 A.3d at 577-78, or the one in the Second Circuit's seminal decision on

---

[11] On a similar note, Prophet's argument that the Court can infer its third-party beneficiary status by looking to "the interwoven language of the Transaction Documents" is unpersuasive. Opposition at 10. To be sure, Prophet is correct that both Delaware law, which controls the Trust Agreement, and New York law, which controls the Indenture and the Servicing Agreement, *see* Servicing Agreement § 8.05, encourage courts to harmonize documents from a single transaction and to read them in tandem. *See, e.g.*, *Ashall Homes Ltd. v. ROK Ent. Grp. Inc.*, 992 A.2d 1239, 1250 (Del. Ch. 2010) ("[C]ontemporaneous documents should be read together . . . ."); *Carvel Corp. v. Diversified Mgmt. Grp., Inc.*, 930 F.2d 228, 233 (2d Cir. 1991) ("Under New York law, instruments executed at the same time, by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together."). And, as further discussed below with reference to New York law, "[i]n determining whether the parties intended to benefit the third party, a court should consider the circumstances surrounding the transaction as well as the actual language of the contract." *Bayerische Landesbank, N.Y. Branch v. Aladdin Cap. Mgmt. LLC*, 692 F.3d 42, 52 (2d Cir. 2012) (internal quotation marks omitted). But that principle cannot override the plain language of the Trust Agreement, particularly when the Delaware Supreme Court has explicitly held that "[a] third-party beneficiary's rights are measured by the terms of the contract." *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 270-71 (Del. 2022) (internal quotation marks omitted). And, relatedly, Delaware law also mandates that a court "construe the agreement as a whole, [but also] giv[e] effect to all provisions therein." *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012). The Court cannot credit an argument based on language in the Indenture or even the overall structure of the Transaction Documents in the face of the Trust Agreement's explicit inclusion of "expressly provided herein" in its no-third-party beneficiary clause.

third-party beneficiaries under New York law, *Consolidated Edison, Inc. v. Northeast Utilities*, 426 F.3d 524, 528 (2d Cir. 2005), the Trust Agreement's no third-party beneficiary provision does not specify upfront the other provisions for which Noteholders are third-party beneficiaries. Rather, similar to the third-party beneficiary clause in *Bayerische Landesbank*, 692 F.3d at 53, Section 11.03's "expressly provided herein" language appears to require a provision-by-provision analysis of the remainder of the Agreement in order to ascertain whether the Noteholders were expressly intended as beneficiaries thereof. *Cf.* Trust Agreement § 1.02(c) (providing that "'herein' . . . refer[s] to the Trust Agreement as a whole").

Section 2.03(vi) authorizes the Trust—and the Owner Trustee acting on its behalf—"to enter into, execute, deliver and perform its obligations" under the Transaction Documents, including the Indenture and the Servicing Agreement. Trust Agreement § 2.03(vi). It also more specifically allows the Majority Certificateholder to direct the actions of the Trust in certain ways, "provided, however, that prior to the Indenture Termination Date, the Majority Certificateholder's right to direct the Trust shall be limited to actions in furtherance of the transactions contemplated by the Indenture and the Servicing Agreement." *Id.* Prophet asserts that this language confers third-party beneficiary status onto the Noteholders for purposes of this provision by pointing to the fact that Section 2.03(vi) "expressly provid[es] for the protection of Noteholders by prohibiting actions not in furtherance of the Indenture." Opposition at 11. Defendants counter that Section 2.03(vi) "addresses 'the Majority Certificateholder's right to direct the Trust,'" without mention of the Noteholders. Reply at 6.

The task of determining whether Section 2.03(vi) falls within the ambit of "expressly provided" under Section 11.03 simply proves too elusive to warrant dismissal of the Second Cause of Action at the pleadings stage. *See* Opposition at 11; *GMG Cap. Invs.*, 36 A.3d at 780 (noting

that, under Delaware law, "an ambiguity exists when the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings" (internal quotation marks and alteration omitted)).  On one hand, other sections of the Trust Agreement illustrate that the contracting parties knew how to expressly specify when the Noteholders were intended beneficiaries.  Section 4.04 provides one example; that provision prohibits the Trust from engaging in a wide range of conduct and—more importantly for this analysis—also disallows any amendment of that section "without the prior written consent of 100% of the holders of the Notes." Trust Agreement § 4.04.  Section 4.01 similarly prohibits the Trust or anyone acting on its behalf from declaring bankruptcy (among other actions) unless the Indenture Trustee instructs the Trust to do so "upon [the Indenture Trustee's own] receipt of instruction from a majority of Noteholders pursuant to Section 5.03 of the Indenture."  *Id.* § 4.01.  These clauses may well show that Section 2.03(vi), despite Prophet's protestations, is not encompassed by the ambit of Section 11.03's third-party beneficiary provision.  After all, the *expressio unius* canon can be just as instructive regarding the omission of a term in a contract under Delaware law as in a statute, *see McDonald's Corp. v. Easterbrook*, C.A. No. 2020-658 (RJS), 2021 WL 351967, at *5 n.42 (Del. Ch. Feb. 2, 2021), and, as noted, these "parties kn[ow] how to confer third-party beneficiary status" when they want to do so, *Crispo*, 304 A.3d at 575.  In other words, Sections 4.01 and 4.04 might illustrate that the parties knew how to explicitly confer beneficiary rights onto the Noteholders, and the lack of parallel language in Section 2.03(vi) could support Defendants' position.

On the other hand, the Second Circuit's decision in *Bayerische Landesbank* could bolster Prophet's proposition that the Trust Agreement's more general language about Noteholders confers third-party beneficiary status on the Noteholders writ large.  Like Section 2.03(vi), the contract at issue in *Bayerische Landesbank* contained a provision obligating the portfolio manager

to "perform its obligations hereunder in accordance with the terms of this Agreement and the terms of the Transaction Documents applicable to it." *Bayerische Landesbank*, 692 F.3d at 54 (internal quotation marks omitted).  The Second Circuit concluded that this provision, along with others, meant that "[d]rawing all inferences in favor of the plaintiff, a plausible reading of the parties' Agreement is that the [relevant contract] expressly requires the Portfolio Manager to perform various obligations—including managing the Reference Portfolio—on behalf of the Noteholders." *Id.* at 55.  Here, the reference to "transactions contemplated by the Indenture and the Servicing Agreement," Trust Agreement § 2.03(vi), appears to suggest that the Majority Certificateholder only had the right to direct the Trust to enter into transactions that would abide by, for instance, the Indenture's prioritization of Noteholders over Certificateholders in relevant circumstances. *See* Indenture § 3.03; Complaint ¶ 24.  The incorporation of these requirements into Section 2.03(vi) could mean that the benefit to the Noteholders contemplated in the same provisions of the Transaction Documents were also incorporated into the provision.

To be sure, the provision in *Bayerische Landesbank* is distinguishable.  It included a limited but explicit right for at least some Noteholders to enforce these obligations.  *Bayerische Landesbank*, 692 F.3d at 54 ("The Portfolio Manager agrees that such obligations shall be enforceable at the insistence of each Issuer, the Trustee on behalf of the holders of the relevant Notes, or the requisite percentage of holders of the relevant Notes on behalf of themselves, as provided in the relevant Indenture." (internal quotation marks omitted)).  The Trust Agreement appears to lack similar language.  And *Bayerische Landesbank*'s application of New York law might also have limited bearing on the Trust Agreement, which—as noted above—is in large part governed by Delaware law.  *See supra* I.A.1.  But Prophet only needs a *plausible* interpretation of the contract; after all, "[u]nless for some reason an ambiguity must be construed against the

plaintiff, a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings." *Bayerische Landesbank*, 692 F.3d at 53.  Because the Trust Agreement's language on third-party beneficiaries is ambiguous in the context of the text of Section 2.03(vi), and given that Defendants do not challenge the Second Cause of Action on the merits, the Court denies the motion to dismiss as to the direct version of that cause of action.[12]

### 3.      Third Cause of Action: Breach of the Servicing Agreement

Defendants raise a similar third-party beneficiary issue for the Third Cause of Action, which alleges breach of the Servicing Agreement.  They specifically point to Sections 8.14 and 8.15 of the Agreement, which state respectively that "the Seller [*i.e.*, RBS Financial Products] shall be a third party beneficiary to this Agreement to the extent set forth herein," Servicing Agreement § 8.14, and that "[t]he Owner Trustee will be an intended third-party beneficiary of this Agreement solely for the purposes of Sections 3.23, 6.01 and 8.15 hereof," *id.* § 8.15, without mention of the Noteholders.  *See* Motion at 15.  Prophet retorts that the lack of "contractual language *negating* at intent to benefit [the Noteholders]" and the more general fact that "the entire Servicing Agreement, and the obligations thereunder, is expressly intended to benefit the Noteholders" illustrate that it is a third-party beneficiary of the Agreement.   Opposition at 11-12 (internal quotation marks omitted).

Unlike the Trust Agreement, the Servicing Agreement is governed by New York law.  *See* Servicing Agreement § 8.05.  Under New York law, "[a] third party may sue as a beneficiary on a contract made for [its] benefit.  However, an intent to benefit the third party must be shown, and,

---

[12] While Prophet points out that Defendants exceeded the scope of the Court's supplemental briefing request by addressing this issue in their supplemental brief, *see* Defendants' Supplemental Brief at 9-10; Dkt. 100 at 1-2, nothing in the parties' supplemental briefing changed the Court's analysis on this topic.  The Court therefore sees no need to strike that portion of Defendants' Supplemental Brief.

absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts." *Dormitory Auth. v. Samson Constr. Co.*, 94 N.E.3d 456, 459 (N.Y. 2018) (internal quotation marks omitted) (alterations in original). "In determining whether the parties intended to benefit the third party, a court should consider the circumstances surrounding the transaction as well as the actual language of the contract." *Bayerische Landesbank*, 692 F.3d at 52 (internal quotation marks omitted).

Defendants' argument is unavailing and runs afoul of *Bayerische Landesbank*. Much like here, the defendant there argued that the explicit naming of one third-party beneficiary showed that unnamed parties could not be third-party beneficiaries. *Id.* at 53. The Second Circuit rejected this argument, reasoning—at least at the pleadings stage—that the contract's reference to "'*an* intended third party beneficiary' has no language of limitation and could be read as clarification that, whomever else might be a third-party beneficiary, the [named party] is for certain." *Id.* at 54. So too here. The Servicing Agreement uses the same "*a* third party beneficiary" language. Servicing Agreement § 8.14 (emphasis added). The Court therefore declines to dismiss the direct version of the Third Cause of Action on contractual standing grounds.

Turning to the merits, the parties appear to agree that this cause of action is predicated on alleged breaches of Sections 7.01 and 7.04 of the Servicing Agreement. *See* Motion at 17; Opposition at 18-19. As to the former, Prophet alleges that Christiana Trust violated its obligation under Section 7.01 by not "notify[ing] DCM that it was failing to observe and perform its duties in any material respect," or more specifically by "fail[ing] to notify DCM that it was not properly servicing the Mortgage Loans." Compl. ¶ 58. This allegation is predicated on Section 7.01(ii), which mandates that an Event of Default is triggered if any of the "Indenture Trustee, the Credit Risk Manager, the Paying Agent or the Issuer" provides written notice to the Servicer of "any

failure on [its] part . . . duly to observe or perform in any material respect any other of the covenants or agreements . . . set forth in this Agreement which continues unremedied for a period of thirty (30) days." Servicing Agreement § 7.01(ii). Defendants object that this section merely sets forth the triggers for an Event of Default, rather than obligating any of the parties named therein to notify the Servicer of a breach. *See* Motion at 17. Prophet counters that "[i]t would make no sense to say that the Owner Trustee or the Indenture Trustee had no obligation under the Servicing Agreement to ensure that the Servicer performed *any* of its duties" and that the Court should consider the "interrelated purpose of the Transaction Documents." Opposition at 19. It further contends that "CT was in the best position to observe DCM's failures to service the Loans." *Id.*

Defendants have the better of the argument. The Court is bound by the plain language agreed to by the parties to the Servicing Agreement. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) ("Under New York law, . . . a court must enforce th[e] plain meaning [of a contract], '[r]ather than rewrite an unambiguous agreement.'" (first alteration in original) (quoting *Am. Express Bank Ltd. v. Uniroyal*, 562 N.Y.S.2d 613, 614 (1st Dep't 1990))); *Ashland Glob. Holdings Inc. v. Valvoline, Inc.*, No. 21 Civ. 498 (RA), 2022 WL 219997, at *5 (S.D.N.Y. Jan. 25, 2022) ("The Court cannot consider 'purpose' . . . if the contractual language regarding a particular obligation is clear."). Nor may the Court read affirmative contractual obligations into the Servicing Agreement that are not found in its plain terms. *Ashland Glob. Holdings*, 2022 WL 219997, at *5; *accord Thales Alenia Space Fr. v. Thermo Funding Co., LLC*, No. 13 Civ. 712 (SAS), 2014 WL 3887711, at *3 (S.D.N.Y. Aug. 7, 2014) ("In determining a party's obligations under a contract, it is not for the court to 'supply a specific obligation the parties themselves did not spell out.'" (quoting *Tonking v. Port Auth. of N.Y. & N.J.*, 821 N.E.2d 133, 135 (N.Y. 2004))).

Prophet has failed to identify any provision of the Servicing Agreement that imposes an affirmative obligation to notify the Servicer of a breach. Section 7.01 by its plain terms only sets forth a trigger event for a default, not a notification requirement. Meanwhile, other provisions of the Servicing Agreement illustrate that the contracting parties knew how to include a notice requirement. Section 3.03(d)(1), for instance, mandates that "[e]ach Servicer will provide written notice to the Credit Risk Manager . . . identifying any Mortgage Loan with respect to which the foreclosure sale date has been scheduled." Servicing Agreement § 3.03(d)(1). Section 4.02 is particularly instructive in that regard by requiring that any of the Issuer, the Indenture Trustee, the Credit Risk Manager, or the Paying Agent to "give prompt written notice to the others" (*i.e.*, the other three listed parties) of any breach of the Servicer warranties mentioned in Section 4.01 "that materially and adversely affects the ability of a Servicer to perform its duties and obligations under this Agreement or otherwise materially and adversely affects the value of the Mortgage Loans," among other items. Servicing Agreement § 4.02. Yet no equivalent, mandatory notice language is found in Section 7.01. *Cf. Avon Co. v. Fareva Morton Grove, Inc.*, No. 22 Civ. 4724 (AKH), 2022 WL 2208156, at *6 (S.D.N.Y. June 21, 2022) ("These are sophisticated parties that plainly knew how to be specific and impose limitations in other provisions. Their failure to impose such a limitation or obligation in [the relevant provision] is strong evidence that the omission was intentional."). Nor has Prophet pointed to any provision of the Servicing Agreement that otherwise establishes such a requirement. In sum, because Section 7.01 unambiguously does not provide for a notice requirement, the Court dismisses the Third Cause of Action to the extent that it is predicated on a violation of Section 7.01.[13]

---

[13] In light of this conclusion, the Court need not address Defendants' argument concerning notice from the other parties; namely, the proposition that Prophet's failure to allege "that DCM

Section 7.04, which concerns the right of the Majority Certificateholder to appoint a successor Servicer after the Trust terminates one without cause, presents a different scenario, however. The parties appear to agree that the Complaint alleges that Christiana Trust as the Owner Trustee breached Section 7.04. *See* Motion at 19 (referring to "Prophet's claim against the Owner Trustee for breach of Section 7.04"); Opposition at 18 ("[T]he engagement of DCM [as the successor Servicer] were acts of the Trust by the Owner Trustee . . . ."). Defendants claim that this aspect of the Third Cause of Action warrants dismissal because "the Servicing Agreement places no duty or obligation on the Owner Trustee to ensure that the successor Servicer meets the requirements under the Servicing Agreement." Motion at 18. Prophet retorts that "CT cannot hide behind the direction it received from Browndorf because CT was not permitted to follow directions that were 'contrary to the terms . . . of any Transaction Document.'" Opposition at 18-19 (quoting Trust Agreement § 6.03(a)).

The central question here is the extent to which the Owner Trustee can be held liable for actions taken at the direction of the Majority Certificateholder. Defendants' argument about the Owner Trustee owing no duty or obligation under Section 7.04 is unavailing, given that the Trust Agreement does create a limited scope of liability for the Owner Trustee when it acts upon instructions of the Majority Certificateholder. Section 7.01 of the Trust Agreement stipulates that the Owner Trustee generally "shall not be answerable or accountable hereunder or under any Transaction Document under any circumstances, except . . . for its own willful misconduct, bad faith or gross negligence." Trust Agreement § 7.01. That same provision also applies to the general limitation on the Owner Trustee's liability for actions it takes on instruction of a

---

did not receive any . . . notice [concerning its failures] from either the Credit Risk Manager or the Paying Agent" is fatal to the Third Cause of Action inasmuch as it is predicated on Section 7.01. Motion at 18.

Certificateholder.  *Compare id.* § 7.01(b) ("[T]he Owner Trustee shall not be personally liable with respect to any action taken or omitted to be taken by it in accordance with the instructions . . . any Certificateholder or any other Person authorized to instruct the Owner Trustee hereunder . . . .") *with id.* § 7.01 (providing that the willful misconduct, bad faith or gross negligence exception applies to all subsections of Section 7.01).  As Defendants have failed to grapple with this provision in this context, the Court also need not determine Section 7.01's application to the conduct at issue, given that "the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)." *Leon v. Rockland Psychiatric Ctr.*, 232 F. Supp. 3d 420, 426-27 (S.D.N.Y. 2017) (internal quotation marks omitted).  In other words, given the fact that Section 7.01 of the Trust Agreement may plausibly create liability for the Owner Trustee for the actions it took on the Majority Certificateholder's behalf, including—as relevant here—appointing DCM as the successor Servicer, the mere fact that Section 7.04 of the Servicing Agreement does not directly speak to the Owner Trustee's obligations does not preclude liability.  In the absence of other arguments, the Court declines to dismiss the Third Cause of Action, albeit only to the extent that it is predicated on the Owner Trustee's alleged violation of Section 7.04.

### 4.     Fourth Cause of Action: Breach of Fiduciary Duty

Defendants move to dismiss the Fourth Cause of Action on the basis that Prophet's breach of fiduciary duty claims are duplicative of its breach of contract claims.  Motion at 19-20.  This cause of action appears to be predicated on two fiduciary duties.  First, the Complaint alleges that the Indenture Trustee violated its "contractual and legal" duty to act prudently after the Event of Default had occurred.  Compl. ¶ 87; *see generally id.* ¶¶ 84-91.  The Complaint specifically points to Section 6.01 of the Indenture, which provides that "[i]f an Event of Default has occurred and is continuing, the Indenture Trustee shall . . . use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's

own affairs."  Indenture § 6.01; *see* Compl. ¶ 84.  Prophet alleges that the Indenture Trustee violated this duty by, among other ways, "allow[ing] DCM to continue 'servicing' the loans as Servicer, when it was aware that DCM clearly was not servicing anything," failing to adequately investigate "what assets remain[ed] in the Trust" and whether "there [was] any recourse to regain the property," and failing to "undertake a review of its remittance reporting to confirm it is accurate."  Compl. ¶¶ 88-90; *see also id.* ¶ 137 (similar).  Second, the Complaint also alleges that Christiana Trust as the Indenture Trustee failed to abide by its "unwaivable duty to avoid conflicts of interest and act in the interest of Noteholders" by acting simultaneously as the Indenture Trustee and the Owner Trustee, positions which Prophet claims "are irreconcilably conflicted."  Compl. ¶ 92.

"Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated."  *Bayerische Landesbank*, 692 F.3d at 58.  "Such a 'legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.'"  *Id.* (quoting *Clark-Fitzpatrick v. Long Island R.R. Co.*, 516 N.E.2d 190, 194 (N.Y. 1987)).[14] "If . . . the basis of a party's claim is a breach of solely contractual obligations, such that the plaintiff is merely seeking to obtain the benefit of the contractual bargain through an action in tort, the claim is precluded as duplicative."  *Id.*

The Court concludes that Prophet's duty of prudence claim is duplicative, but not its conflicts of interest claim.  Starting with the alleged breach of the duty of prudence, the

---

[14] Defendants at times refer to this principle as the "economic loss doctrine," *see, e.g.*, Motion at 21, but the New York Court of Appeals recently clarified that this usage "conflate[s] our 'economic loss' rule [which is a products liability concept] with the prohibition against duplicative contract and tort claims," *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 220 N.E.3d 646, 656 (N.Y. 2023).

Complaint's citation to Section 6.01 of the Indenture is particularly revealing: the duty of prudence obligation is encompassed by the Indenture—or at the very least "implied within its terms"—and thus is duplicative thereof.  *Ambac Assurance Corp. v. U.S. Bank Nat'l Ass'n*, 328 F. Supp. 3d 141, 156-57 (S.D.N.Y. 2018) (collecting cases); *see* Indenture § 6.01 ("If an Event of Default has occurred and is continuing, the Indenture Trustee shall . . . use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.").  Prophet claims that Defendants have failed to show that that the breach of fiduciary duty claim relies on the same specific actions as its breach of contract claim. *See* Opposition at 22.  But that argument misses the point of the inquiry.

While it is true that courts applying New York law have analyzed overlap between a plaintiff's breach of fiduciary duty and contract claims as one method of showing a tort claim's duplicative nature, overlap is not the only factor to be considered.  The focus is rather on the *duties* encompassed by the relevant contract, as stated by the New York Court of Appeals in *Clark-Fitzpatrick.  See, e.g.*, *Ambac Assurance Corp.*, 328 F. Supp. 3d at 156-57 ("Because U.S. Bank's post-[event of default] duties to act prudently and in good faith are essentially subsumed within the language of the [contracts] . . . they cannot form the basis for a breach of fiduciary duty claim." (internal quotation marks omitted)); *Fixed Income Shares: Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 857 (S.D.N.Y. 2015) (dismissing a fiduciary duty claim for being duplicative because "it allege[d] that Citibank breached its fiduciary duty 'to exercise its contractually conferred rights and powers in good faith'"); *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n*, 109 F. Supp. 3d 587, 609 (S.D.N.Y. 2015) (dismissing a negligence claim for being duplicative because it was "effectively a claim that HSBC violated its contractual obligation to force others to cure").  In sum, because Section 6.01 for all intents and purposes provides the relevant duty related to

Prophet's breach of the duty of prudence claim, the Fourth Cause of Action is dismissed insofar as it is predicated thereon.

Defendants' arguments for dismissal of the duty of loyalty component of the Fourth Cause of Action are less persuasive.  Defendants claim that "Prophet does not actually allege that the Indenture Trustee breached this purported duty."  Motion at 19.  This assertion cannot be reconciled with the Complaint's allegations concerning conflicts of interest, Compl. ¶¶ 92-93, which—as Prophet points out—encompass the avoidance thereof.  *See* Opposition at 23; *see generally Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989) (holding that a fiduciary's duty of loyalty "bar[s] not only blatant self-dealing, but also requir[es] avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty").  The same logic applies to Defendants' argument that "Prophet makes no allegations regarding any . . . self-dealing."  Motion at 20.  In the absence of other arguments, the Court will allow the Fourth Cause of Action to proceed, albeit only as predicated on the conflicts of interest theory alleged in the Complaint.[15]

### 5.       Fifth Cause of Action: Negligence and Gross Negligence

Defendants move to dismiss the Fifth Cause of Action for negligence and gross negligence on three different bases.  The Court will address each in turn.

---

[15] It bears noting that several decisions in this District have concluded that "[a]llegations of breach of an independent duty to avoid conflicts of interest are properly pled as negligence claims, not as breaches of any fiduciary duty."  *Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 689 (S.D.N.Y. 2019); *see also Phoenix Light SF Ltd. v. Bank of New York Mellon*, No. 14 Civ. 10104 (VEC), 2015 WL 5710645, at *7 (S.D.N.Y. Sept. 29, 2015) (collecting cases).  But Defendants do not advance this argument for dismissal of the Fourth Cause of Action, and the Court is loath to exercise its power to dismiss *sua sponte*.  *Cf. Wachtler v. Cnty. of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994), *abrogated on other grounds as recognized by Murphy v. Hughson*, 82 F.4th 177, 184 (2d Cir. 2023) ("The district court has the power to dismiss a complaint *sua sponte* for failure to state a claim, so long as the plaintiff is given notice and an opportunity to be heard." (internal quotation marks omitted)).

The first challenge concerns the allegedly ministerial acts Christiana Trust performed as the Indenture Trustee.   Under New York law, "indenture trustees owe note holders an extracontractual duty to perform basic, nondiscretionary, ministerial functions redressable in tort if such duty is breached."  *AG Cap. Funding Partners, L.P. v. State Street Bank & Tr. Co.*, 896 N.E.2d 61, 67 (N.Y. 2008).  Defendants claim that much of the Fifth Cause of Action improperly concerns non-ministerial acts that do not give rise to such a duty, including "fail[ing] to preserve Trust assets by knowingly permitting DCM to serve as successor Servicer" despite Christiana Trust's receipt of "specific evidence" about DCM's lack of qualifications to act as a Servicer, "fail[ing] to properly ensure that the number of Mortgage Loans in the Trust was properly reported following sales [thereof]," and "refus[ing] to appear after having been served with legal process following an Event of Default."  Compl. ¶¶ 142-145; *see* Motion at 20-21.  Defendants point to the fact that "[c]ourts thus have dismissed tort claims against trustees grounded in non-ministerial acts such as monitoring trust assets, reviewing mortgage files, and notifying investors."  Motion at 20 (quoting *Pac. Life Ins. Co. v. Bank of New York Mellon*, No. 17 Civ. 1388 (KPF) (RWL), 2022 WL 1446552, at *37 (S.D.N.Y. Feb. 22, 2022) (collecting cases), *report and recommendation adopted in relevant part*, 2023 WL 5128079, at *33 (S.D.N.Y. Aug. 10, 2023)). Prophet both contests Defendants' characterization of some of the acts—more specifically, "notif[ying] Noteholders of SLS's concerns" regarding DCM's appointment as the successor Servicer and accurately reporting the number of mortgage loans—and more generally questions the appropriateness of determining the ministerial nature of any given act at the pleadings stage. Opposition at 20.

The Court begins and ends with the threshold question of whether resolving this dispute is appropriate on a motion to dismiss.  It is well-established that "fact-intensive inquir[ies] typically

should not be resolved on a motion to dismiss." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 60 (2d Cir. 2022). Courts in this District and elsewhere nevertheless appear to be split over whether determining an act's ministerial nature is appropriate at the pleadings stage. *Compare Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 193 (S.D.N.Y. 2011) (dismissing a breach of fiduciary duty claim because it "plainly d[id] not involve basic non-discretionary ministerial tasks" (internal quotation marks omitted)) *and Commerce Bank v. Bank of New York Mellon*, 35 N.Y.S.3d 63, 65 (1st Dep't 2016) (affirming the dismissal of part of a negligence claim because "[a] failure to monitor other parties 'plainly do[es] not involve the performance of basic non-discretionary ministerial tasks'" (quoting *Ellington*, 837 F. Supp. 2d at 193)) *with Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 720-21 (S.D.N.Y. 2016) ("[The defendant] contends that determining whether a servicer breached its obligations and whether to provide a notice of breach are not ministerial tasks. Whether the tasks were in fact ministerial or not is also not an issue that can be resolved on a motion to dismiss.").

By citing to *Ellington*, the decision of the First Department in *Commerce Bank* may well indicate that New York courts would view the question of whether an act is ministerial as a question of law resolvable on a motion to dismiss, albeit perhaps only when such a conclusion is clear-cut. *Cf. Reddington v. Staten Island Univ. Hosp.*, 511 F.3d 126, 133 (2d Cir. 2007) ("Decisions of New York's intermediate appellate courts are helpful indicators of how the Court of Appeals would decide, but we are not strictly bound by decisions of the Appellate Division, particularly when we have persuasive data that the Court of Appeals would decide otherwise."). However, as observed by other district courts that have parsed *Commerce Bank*, the decision's relative brevity renders it difficult to draw any concrete conclusions therefrom. *See Pacific Life Ins. Co.*, 636 F. Supp. 3d at 411 n.37 ("As several courts in this District have found, however, the

limited analysis in *Commerce Bank* is not persuasive in light of other authority.") (collecting cases).

In any case, it is not obvious whether the alleged acts relevant to the Fifth Cause of Action should be characterized as ministerial. At least some of the alleged ministerial activities are more concrete than the "broadly stated failures to monitor [the servicer] and safeguard trust assets" at issue in *Ellington*, 837 F. Supp. 2d at 193; for instance, not appearing in a court action after being served with process, *see* Compl. ¶ 145. Other examples are less clear-cut: "assist[ing] . . . in [the] transfer[ of] Mortgage Loans," depending on the context, might have been discretionary or nondiscretionary. *Id.* ¶ 144. All in all, the extent to which the alleged actions here were ministerial is a fact-intensive inquiry that is better suited to be resolved at later stages of this litigation, and the Court thus declines to dismiss the Fifth Cause of Action on that basis.

Defendants also challenge several of the allegedly ministerial acts on the basis that they were acts of Christiana Trust as the Owner Trustee, and not as the Indenture Trustee, specifically, (1) the appointment of DCM as the successor Servicer and the related failure to ensure that DCM was qualified for that position, (2) the reporting of the number of mortgage loans in the Trust, and (3) the loan sales to a Browndorf-affiliated entity. Motion at 21-22. Prophet argues that the Owner versus Indenture Trustee is—at least in this context—a distinction without a difference, since "the crux of the Complaint is that, in practice, [Christiana Trust] acted (and failed to act) through the same person in both capacities." Opposition at 21. The Court disagrees. As detailed above in relation to the Fourth Cause of Action, New York law demands a fine distinction between contractual and extracontractual duties in assessing the viability of concurrent breach of contract and tort claims. And, relatedly, the extracontractual duty relevant here is that of the *Indenture* Trustee under New York law "to perform basic, nondiscretionary, ministerial functions." *AG Cap.*

*Funding Partners*, 896 N.E.2d at 67.  This accords with the fact that "[u]nlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement," and the Second Circuit and other courts have thus been loath to "impos[e] . . . additional duties on the trustee in light of the special relationship that the trustee already has with both the issuer and the debenture holders under the indenture," at least pre-default, with the exception of the extracontractual duties detailed above.  *Elliott Assocs. v. J. Henry Schroder Bank & Tr. Co.*, 838 F.2d 66, 71 (2d Cir. 1988) (internal quotation marks omitted).

To be sure, Prophet in its supplemental briefing identified extracontractual duties arising from the Owner Trustee's ostensibly "special or privity-like relationship" to the Noteholders as the relevant extracontractual duty, as further detailed below.  *See* Prophet's Supplemental Brief at 5 (quoting *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 405 (2d Cir. 2015)).  The Court ultimately concludes—albeit somewhat reluctantly—that the Fifth Cause of Action inasmuch as it is predicated on the Owner Trustee's actions should be allowed to proceed at this juncture because of choice-of-law concerns related to this theory that the parties did not address in their supplemental briefing.  The parties' briefing makes it appear as though there is some tension between Delaware and New York law—or at least the Chancery Court's decision in *In re National Collegiate Student Loan Trust Litigation*, 251 A.3d 116, 187 (Del. Ch. 2020), and the Second Circuit's decision in *Bayerische Landesbank*—concerning the Owner Trustee's extracontractual duties.

The relevant disputes about the Owner Trustee in large part revolve around Section 6.04 of the Trust Agreement.  As relevant here, that provision dictates that:

> The Owner Trustee shall not have any duty or obligation to manage . . . or otherwise deal with the Trust or the Trust Estate, or to otherwise take or refrain

from taking any action under . . . except as expressly provided by the terms of the Trust Agreement or in any document or written instruction received by the Owner Trustee pursuant to Section 6.03 or any other provision of the Trust Agreement; and no implied duties (including fiduciary duties) or obligations shall be read into the Trust Agreement or any Transaction Document against the Owner Trustee.

Trust Agreement § 6.04.

In *National Collegiate*, the Chancery Court held that nearly identical language to this provision—including language to the effect that "no implied duties or obligations shall be read into this Agreement against the Owner Trustee"—meant that "the plain language of the Trust Agreement forecloses any notion that the Owner Trustee owes any extra-contractual duties (fiduciary or otherwise) to the Noteholders," *In re Nat'l Collegiate Student Loan Trs. Litig.*, 251 A.3d at 187, given that Section 3806(c) of the Delaware Statutory Trust Act allows a trustee's "duties (including fiduciary duties) to a statutory trust or to another trustee or beneficial owner or to another person that is a party to or is otherwise bound by a governing instrument . . . [to] be expanded or restricted or eliminated by provisions in the governing instrument; provided, that the governing instrument may not eliminate the implied *contractual* covenant of good faith and fair dealing," Del. Code Ann. tit. 12 § 3806(c) (emphasis added). *See also Allen v. Encore Energy Partners, L.P.*, 72 A.3d 93, 100-01 (Del. 2013) (holding that a clause specifying that a general partner "shall [not] have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner" meant that the general partner "only owe[s] the fiduciary duties expressed in the [contract]; they do not owe common law fiduciary duties" under a statutory scheme similar to the DSTA).[16]  On the other hand, under New York law "[a] legal duty independent of contractual

---

[16] Prophet's citation to *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096 (Del. Ch. 2008), is unavailing because the provision on which the defendants relied in that case is distinguishable from Section 6.04; indeed, the provision did not so much as include the word "duty." *Id.* at 1114; *see* Prophet's Supplemental Brief at 5.

obligations may be imposed by law as an incident to the parties' relationship," including in the context of commercial transactions. *Bayerische Landesbank*, 692 F.3d at 59 (quoting *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1369 (N.Y. 1992)) (alteration in original).  The Second Circuit held that, to make such a showing, "a plaintiff must establish that (1) the defendant had awareness that its work was to be used for a particular purpose; (2) there was reliance by a third party known to the defendant in furtherance of that purpose; and (3) there existed some conduct by the defendant linking it to that known third party evincing the defendant's understanding of the third party's reliance." *Id.* at 59.

To be abundantly clear, the Court is not holding today that an actual conflict exists, particularly in the absence of briefing under a choice-of-law analysis.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[I]n both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." (internal quotation marks omitted)).  The Court raises this difference instead because Defendants' Owner Trustee-related arguments for the Fifth Cause of Action hinge on their assertion that "Prophet's negligence claim against the Owner Trustee is governed by Delaware law (not New York law)," which in turn could make the logic of *National Collegiate* apposite to the negligence claim.  Defendants' Supplemental Brief at 4.  More generally, what is apparent from the parties' briefing is that the impact of Section 6.04 on the Fifth Cause of Action might vary depending on which jurisdiction's laws apply to Prophet's tort claims.

"A federal court sitting in diversity or adjudicating state law claims that are pendent to a federal claim must apply the choice of law rules of the forum state. . . .  [However, i]f no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply

New York law." *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (internal quotation marks omitted). "Under New York law, . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause." *Fin. One Public Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005). "New York courts apply the law of the place where the tort occurred with regard to 'conduct regulating' rules, including the duty of care." *PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 486 (S.D.N.Y. 2017) (internal quotation marks omitted); *see also Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018) ("New York courts treat negligence . . . laws as conduct-regulating laws."). But that proves no easy task in this case. As alleged in the Complaint, Christiana Trust has its "main office" in Delaware and Prophet is a Delaware limited partnership with its principal place of business in Texas. Compl. ¶¶ 9-10. Given these facts, it may well be that "the wrong and the injury t[ook] place" in different jurisdictions, with Christiana Trust's allegedly negligent or grossly negligent acts taking place in Delaware but the ensuing financial injury to Prophet occurring in Texas. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 50 (2d Cir. 2013) (quoting *Babcock v. Jackson*, 191 N.E.2d 279, 280 n.2 (N.Y. 1963)). The Second Circuit has held that "it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectations of the parties who relied on [the laws of that place] to govern their primary conduct and in the admonitory effect that applying its law will have on similar conduct in the future.'" *Id.* at 50-51 (quoting *Schultz v. Boy Scouts of Am.*, 480 N.E.2d 679, 684-85 (N.Y. 1985)); *cf. Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, No. 16 Civ. 1545 (DRH) (ST), 2022 WL 426199, at *8 (E.D.N.Y. Feb. 11, 2022) ("In the case of a plaintiff corporation . . . the place of injury is the principal place of business or

location of the business, as opposed to the place of incorporation or organization." (internal quotation marks omitted)). That could militate to a conclusion that Defendants are correct in their assumption that Delaware law should apply, yet the Complaint includes hardly any allegations about where Christiana Trust's actions occurred. To be sure, the documents provided by the parties in their declarations—namely, the June 2020 letter from SLS provided by Prophet and Christiana Trust's November 2021 notice of default provided by Defendants—both list Christiana Trust's address in Wilmington, Delaware. *See* Dkt. 57-1 at 2; Lorenzo Decl., Exh. E at 7. However, the Court concludes that it is simply more prudent to leave the choice-of-law inquiry to a later phase of litigation, in recognition of the fact that "[b]ecause determining what law applies to a party's claims can be a fact-intensive inquiry, courts often decline to make a choice of law determination at the motion to dismiss stage." *VeroBlue Farms USA Inc. v. Canaccord Genuity LLC*, No. 20 Civ. 4394 (JPC), 2021 WL 3913555, at *11 (S.D.N.Y. Sept. 1, 2021) (internal quotation marks omitted), *aff'd*, No. 21-2465-cv, 2022 WL 2133780 (2d Cir. June 14, 2022). The Court does so mindful of Prophet's characterization of the Fifth Cause of Action as a "gap-filling claim[]." Tr. at 45:5. In other words, "the scope of discovery will not be greatly affected by" the Court's declining to pass on the choice-of-law analysis at this point, and these issues "may be addressed at the summary judgment stage, when a more complete record can be presented to allow a reliable choice-of-law determination to be made." *Gaetano Assocs. Ltd. v. Artee Collections, Inc.*, No. 05 Civ. 3329 (DLC), 2006 WL 330322, at *4 (S.D.N.Y. Feb. 14, 2006). The Court thus denies Defendants' motion to dismiss the Fifth Cause of Action inasmuch as it is predicated on acts of the Owner Trustee, with the expectation that the parties will address any potential conflict of laws in a more fulsome fashion in future stages of this case.

Turning to the conflict of interest-based component of the Fifth Cause of Action, Defendants argue that this aspect of the negligence claim should be dismissed both because "the Trust Agreement expressly provides that [Christiana Trust acting as both the Indenture Trustee and the Owner Trustee] is not a conflict of interest" and, more generally, that Prophet "fails to allege any conflict of interest."  Motion at 22.  As to the waiver of conflicts of interest, the Trust Agreement provides that Christiana Trust "as Owner Trustee and Indenture Trustee may discharge its separate functions fully, without . . . regard to conflict of interest principles . . . to the extent that any such conflict or breach arises solely from the performance by the Owner Trustee or Indenture Trustee . . . of its express duties set forth in this Trust Agreement," and that "defenses, claims or assertions [related to the performance allowed by the Section] are hereby expressly waived by the other parties."  Trust Agreement § 6.06.  That argument is unavailing.  Even assuming that the Indenture Trustee's pre-default obligation to avoid conflicts of interest can be waived by an express provision, that provision by its own terms does not apply to the Noteholders, who are not parties to the Trust Agreement.  Indeed, there is a certain irony in Defendants' arguing on one hand that the Noteholders are not even third-party beneficiaries of the Trust Agreement, *see supra* III.B.2, and on the other hand that a provision that binds only the parties to said Agreement would apply to the Noteholders.

As for Defendants' arguments on the merits, they claim that the Complaint solely contains a "conclusory allegation that 'conflicts of interest [arose from Christiana Trust] serving as both Owner Trustee and Indenture Trustee.'"  Motion at 22 (quoting Compl. ¶ 146) (alteration in original).  That assertion is incorrect; the Complaint alleges the conflict-of-interest theory with considerably more specificity than Defendants suggest.  Prophet alleges that "the Majority Certificateholder—owned and controlled by Browndorf—has now on at least three occasions

41

directed Christiana Trust to engage in activities that benefit Browndorf and the affiliates he controlled, including DCM-P1 but are a detriment to the Trust Estate, the Collateral and the Noteholders."  Compl. ¶ 92.  In the absence of other arguments, the Court denies Defendants' motion to dismiss the Fifth Cause of Action.

### 6.    Sixth Cause of Action: Aiding and Abetting Fraud

Defendants argue that the Sixth Cause of Action for aiding and abetting fraud should be dismissed because Prophet has failed to allege an underlying fraud.  Under New York law, "[t]o establish liability for aiding and abetting fraud, the plaintiffs must show (1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (second alteration in original) (internal quotation marks omitted).  In turn, "[t]o plead a claim for fraud in New York, a plaintiff must establish, (1) a material, false representation; (2) an intent to defraud thereby; (3) reasonable reliance on the representation; (4) damage to the plaintiff; and (5) actual and proximate causation." *IMG Fragrance Brands v. Houbigant, Inc.*, 759 F. Supp. 2d 363, 383 (S.D.N.Y. 2010).  Aiding and abetting fraud claims are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  *Id.*

Defendants claim that the Sixth Cause of Action is deficient because, among other issues, "Prophet has not alleged that Browndorf and his affiliates made any false statements or misrepresentations to Prophet."  Motion at 23 (internal quotation marks omitted).  Prophet counters in relevant part that "[Christiana Trust]'s assistance was an integral part of the fraudulent scheme to defraud Noteholders, including by disseminating false claims by Browndorf about his [S]ervicer, the Fraudulent Sales, and the loans remaining in the Trust."  Opposition at 24.

Defendants' argument is unavailing.  Direct misrepresentations from Browndorf or his affiliates to Prophet are not the only way through which Prophet can make out an aiding and

abetting claim.  The Second Circuit's decision in *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities LLC*, 568 F.3d 374 (2d Cir. 2009), is instructive in that regard.  There, the plaintiffs alleged in relevant part that the defendant "participated and directly assisted in [the principals'] fraud by presenting false values of the [f]unds' holdings [in reports] at the request of [the principals] with actual knowledge that the information being supplied by [the principals] was false and was being used to mislead investors about the [f]unds' condition and performance."  *Id.* at 379-80.  The Circuit vacated the district court's dismissal of aiding and abetting fraud and fiduciary duty claims after the district court concluded that "the complaint failed to satisfy the burden of pleading proximate causation of the Plaintiffs' losses."  *Id.* at 381.  The Circuit concluded that the complaint sufficiently pleaded proximate causation because the plaintiffs "plausibly and in adequate detail set forth allegations that [the defendant] knowingly placed false values of the [f]unds' holdings in the [reports] published in [its] name . . . [but] knew that investors and potential investors would receive . . . [third-party] statements and audits based on the falsified valuations and would base investment decisions on the fraudulent valuations."  *Id.* at 382.  For purposes of this case, the import of this logic is that an aider and abettor's knowing "disseminat[ion] of false claims," as Prophet states, can suffice as a basis for an aiding and abetting fraud claim.  Opposition at 24.[17]

The Court concludes that Prophet has made such a showing here, particularly for the allegation that Christiana Trust "misrepresented to Noteholders that the November Fraudulent Sale

---

[17] In their supplemental brief, Defendants make much of the fact that the defendant in *Pension Committee* prepared the reports that investors relied on.  *See* Defendants' Supplemental Brief at 5-6.  While that may provide a factual distinction, the legal import of the defendant having prepared the reports remains unclear, as opposed to more broadly disseminating them in some capacity and thereby providing "substantial assistance to advance the fraud's commission." *Lerner*, 459 F.3d at 292.

would cure an Event of Default." Compl. ¶ 153.  As discussed below, this statement appears to be attributable to Christiana Trust as the Owner Trustee.  *See infra* III.B.8.  The Complaint alleges that "Christiana Trust knew that the November Fraudulent Sale would not cure the Event of Default before it notified the Indenture Trustee of the November Fraudulent Sale," given that—by the terms of the purchase agreement—"not a single dollar of the $6,632,721.05 purchase price would be paid to the Payment Account and, therefore, to the Noteholders as required by the Transaction Documents."  Compl. ¶¶ 71-72.  The combination of these facts and the allegation that "Christiana Trust made these material misrepresentations, which it then provided to the Indenture Trustee to be included in a notice to Noteholders," *id.* ¶ 72, fits comfortably within the *Pension Committee* framework: according to the Complaint, Christiana Trust likely knew it was disseminating false information to the Noteholders.  *Cf.* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

As discussed below, *see infra* III.B.8, and as Defendants also point out in their supplemental brief, *see* Defendants' Supplemental Brief at 8-9, the Complaint's allegation that Christiana Trust "misrepresented or knowingly allowed others to misrepresent and continue to misrepresent the number of Mortgage Loans in the Trust" presents a more complex scenario, given that the Paying Agent appears to have been responsible for the remittance reports.  The Complaint nevertheless alleges that Christiana Trust "allow[ed] the Paying Agent to circulate monthly remittance reports to the Noteholders" and that the Indenture Trustee specifically "knew that Christiana Trust had sold loans but failed to report it to the Noteholders."  Compl. ¶ 77.  Defendants retort that certain provisions in the Transaction Documents allowed Christiana Trust to rely on the Paying Agent's reports, *see* Defendants' Supplemental Brief at 8-9, but these contractual provisions shed little light on the extent of Christiana Trust's involvement therein.  Therefore, and

unlike the Court's conclusion with respect to the Eighth Cause of Action—which implicates a more stringent standard of involvement—Christiana Trust's involvement in the issuance of these reports and the implications is a complex factual question that could directly bear on the sufficiency of the Sixth Cause of Action.  Given that "fact-specific questions cannot be resolved on the pleadings," the Court declines to dismiss the Sixth Cause of Action as based on the remittance reports.  *Int'l Code Council*, 43 F.4th at 53 (internal quotation marks and alterations omitted).

Furthermore, it appears as if not all of the Sixth Cause of Action is premised on affirmative misrepresentations.  Despite Prophet's claim in its briefing that Christiana Trust "disseminat[ed] false claims by Browndorf about his servicer," Opposition at 24—which appears to refer to DCM's lack of qualifications to become the successor Servicer—the Complaint, if anything, appears to allege that Christiana Trust's failure was in ignoring SLS's warnings about DCM's lack of qualifications, not that it necessarily disseminated claims about DCM itself.  *See, e.g.*, Compl. ¶ 51.  But Defendants make no argument on that basis, nor about the Complaint's apparent theory of omissions liability writ large.  In the absence of other arguments, the Court declines to dismiss the Sixth Cause of Action.

### 7.      Seventh Cause of Action: Aiding and Abetting Breach of Fiduciary Duty

Much like their arguments with respect to the preceding cause of action, Defendants claim that the Seventh Cause of Action for aiding and abetting breach of fiduciary duty—which is predicated on DCM, as the successor Servicer, owing fiduciary duties to the Trust, Compl. ¶ 157—should be dismissed because Prophet has not shown, as a threshold matter, that DCM owed fiduciary duties to the Trust.

"To state a claim for a breach of fiduciary duties under New York law, a plaintiff must establish: (1) a fiduciary duty existing between the parties; (2) the defendant's breach of that duty;

and (3) damages suffered by the plaintiff which were proximately caused by the breach." *Ellington Credit Fund*, 837 F. Supp. 2d at 191 (internal quotation marks omitted).  As to the first prong, "[i]n New York, a conventional business relationship, without more, is insufficient to create a fiduciary relationship." *Pauwels v. Deloitte LLP*, 83 F.4th 171, 183 (2d Cir. 2023) (internal quotation marks omitted).  "Rather, a plaintiff must show special circumstances that transformed the parties' business relationship into a fiduciary one." *Id.* (internal quotation marks omitted).  "Special circumstances giving rise to a fiduciary duty may be present where the party that relied on the relationship 'reposed confidence in [the other party] and reasonably relied on the other's superior expertise or knowledge.'" *Id.* at 184 (quoting *Wiener v. Lazard Freres & Co.*, 672 N.Y.S.2d 8, 14 (1st Dep't 1998)) (alteration in original).

Prophet's arguments that purport to show a fiduciary duty owed by DCM to the Trust are unavailing.  It bears recalling that the relevant fiduciary relationship alleged is that of DCM to the Trust, yet that fact at times appears to elude Prophet in its arguments.  Compl. ¶ 157.  Prophet claims that "Prophet alleges that proper servicing of the Mortgage Assets is the only way to generate cash flows for the Noteholders."  Opposition at 25 (citing Compl. ¶¶ 27-28).  But the fiduciary duty alleged is not of DCM, as the Servicer, to the Noteholders.  Nor will the fact that Noteholders are the "ultimate beneficiaries of the Servicing Agreement," *id.*, suffice.  Even disregarding the Trust versus Noteholders issue, "the fact that [DCM] took on itself certain contractual responsibilities to service and account for mortgage loan[s] . . . , does not mean that there was the sort of special relation of great intimacy, confidentiality, reliance and superiority of influence, . . . of the sort required for a fiduciary relationship." *Ellington Credit Fund*, 837 F. Supp. 2d at 194.  Indeed, several courts in this District have dismissed allegations predicated on alleged fiduciary duties of mortgage servicers based on servicing agreements. *See id.* at 194-95

(collecting cases).  The Court therefore grants Defendants' motion to dismiss as to the Seventh Cause of Action.

### 8.      Eighth Cause of Action: Fraud

Prophet's fraud claim in its Eighth Cause of Action is predicated on Christiana Trust's allegedly "numerous false statements concerning the Trust to Prophet and all other Noteholders." Compl. ¶ 164.  Prophet more specifically cites to Christiana Trust's November 2021 statement that "the Event of Default is being cured by a loan sale" and the statements about the number of mortgage loans in the October 2021 and October 2022 remittance reports.  *Id.* ¶¶ 165-166.

"Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015).  "At the pleading stage, to withstand a Rule 12(b)(6) challenge in federal court, Plaintiffs must assert facts that plausibly support the inference of fraud."  *Id.* (internal quotation marks omitted).  "Plaintiffs must satisfy the heightened pleading standard set forth in Rule 9(b)."  *Id.*

Defendants press several challenges to this cause of action, but only one is ultimately availing.  First, Defendants claim that Prophet has failed to sufficiently allege reliance because, "[t]hroughout the Complaint, Prophet alleges its damages were caused by DCM's failure to properly service the loans and DCM-P1's appointment of DCM as a servicer and direction to the Owner Trustee to sell several loans in the August and November loan sales."  Motion at 24. Defendants also argue that "[r]egardless of whether Prophet relied on the alleged representations, the injuries it allegedly sustained would have been the same."  *Id.*  But these arguments ignore the fact that Prophet specifically alleges that "Prophet and the other Noteholders reasonably relied upon the statements made by Christiana Trust in maintaining their investment in the Trust and in

forbearing action that could have avoided further damage to the Noteholders and the Trust Estate." Compl. ¶ 168.  Read in light most favorable to Prophet, the Complaint encompasses a theory of reliance in which Prophet sustained damages by continuing to invest in the Trust in reliance on Christiana Trust's allegedly false representations about the loan sales—not only because of the loan sales themselves.  *Cf. Pension Comm. of Univ. of Montreal Pension Plan*, 568 F.3d at 378, 383 (holding that the plaintiffs had adequately stated an aiding and abetting fraud claim when they alleged that the misrepresentations in question "induce[d them] to invest, and remain invested, in the Funds").  The same logic applies to Defendants' claim of a date mismatch; or, more specifically, the notion that the fact of the August loan sale predating the November 2021 statement and the November loan sale postdating the statement by several days somehow detracts from the reliance argument.  This argument, too, fails to account for the Complaint's continued-investment theory of reliance—the gist of the theory is not predicated on the loan sales themselves (nor, by extension, their corresponding dates), but rather that Prophet relied on Christiana Trust's lack of candor about them in the remittance reports and in the November 2021 statement in continuing to invest in the Trust.  Moreover, to the extent that Defendants mean to challenge the reasonableness of Prophet's reliance on Christiana Trust's representations, "the reasonableness of a plaintiff's reliance is a nettlesome and fact-intensive question, which . . . district courts[] will not lightly dispose of at the motion-to-dismiss stage."  *Loreley Fin. (Jersey) No. 3*, 797 F.3d at 186 n. 19 (internal quotation marks omitted).

Defendants also argue that neither the November 2021 statement nor the remittance reports can be attributed to Christiana Trust.  *See* Motion at 25.  As for the November 2021 statement, the Court disagrees.  Prophet correctly points out that this document, to the extent the Court considers it, was signed by Christiana Trust as the Owner Trustee on behalf of the Trust.  *See* Lorenzo Decl.,

Exh. E at 5.[18]  The remittance reports, however, present a more complex scenario.  As discussed

above, these reports are ultimately attributable to the Paying Agent.  To be sure, Christiana Trust

*could* be held liable under New York law for the Paying Agent's statements in the remittance

reports.  "Courts applying New York law have held defendants liable as principals for fraud . . . ,

even when third parties make the alleged misstatements to putative victims . . . where the

defendant has so entangled itself with the issuance of a document that false statements therein may,

in effect, be attributed to the defendant or constitute 'an implied representation [from the

defendant] that the information' being conveyed 'is true or at least in accordance with the

[defendant's] views.'"  *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, No. 12 Civ. 7372 (LJL),

2020 WL 5518146, at *84 (S.D.N.Y. Sept. 14, 2020) (internal quotation marks omitted except for

*Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 163 (2d Cir. 1980), *superseded by statute on other

grounds as stated in Acticon AG v. China N.E. Petroleum Holdings Ltd.*, 692 F.3d 34, 40 (2d Cir.

2012)) (alterations in original).  But nowhere in the Complaint is such a theory alleged.  The fact

that Christiana Trust had "knowledge of the Trust's remittance reports" does not speak to any level

of involvement in the issuance thereof.  Compl. ¶ 57.  Christiana Trust's involvement in the

mortgage loan sales, *see id.* ¶ 77, moves the needle no further, especially given that courts have

held in analogous contexts that the provision of information that ends up in a report alone "does

---

[18]  Although furnished by Defendants, the Court deems this document integral to the
Complaint.  "Where a document is not incorporated by reference, the court may nevertheless
consider it where the complaint relies heavily upon its terms and effect, thereby rendering the
document integral to the complaint."  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir.
2010) (internal quotation marks omitted); *see also Goel v. Bunge*, 820 F.3d 554, 559 (2d Cir. 2016)
("In most instances where this exception is recognized, the incorporated material is a contract or
other legal document containing obligations upon which the plaintiff's complaint stands or
falls . . . .").  This practice is also justified by the fact that Prophet does not appear to contest "the
authenticity or accuracy" of the document, *id.*, as evidenced by Prophet's own use of the document
to rebut Defendants' claims.  *See* Opposition at 24 n.10.

not suggest the kind of control or cooperation in the issuance of the report necessary to render defendants liable for its content," *In re N. Telecom Ltd. Sec. Litig.*, 42 F. Supp. 2d 234, 249 (S.D.N.Y. 1998) (collecting cases).

Given these conclusions, the Court dismisses the Eighth Cause of Action only insofar as it alleges fraud based on the remittance reports and declines to dismiss that cause of action to the extent that it is predicated on the November 2021 statement.

### IV.  Leave to Amend

Lastly, the Court grants Prophet's request for leave to amend.  *See* Opposition at 25.  Under Rule 15(a) of the Federal Rules of Civil Procedure, a court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Court will grant Prophet leave to file an amended complaint in the event that it believes that it can plead facts related to the deficiencies identified above that would adequately state a claim upon which relief may be granted.  Defendants would not be unduly prejudiced by an amendment and are on notice as to the basic circumstances underlying the claims.  The Court emphasizes, however, that Prophet should amend only if it is able to resolve the pleading deficiencies outlined in this Opinion and Order.

### V.  Conclusion

For the foregoing reasons, the Court dismisses the derivative causes of action, in addition to the First Cause of Action as against the Owner Trustee and the Seventh Cause of Action.  The Court declines to dismiss the remaining causes of action, although subject to the confines set forth above.  The Clerk of Court is respectfully directed to close Docket Number 39.

SO ORDERED.

Dated: February 21, 2024
        New York, New York

_____
JOHN P. CRONAN
United States District Judge